**2020 IL 124472**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 124472)

COLIN DEW-BECKER, Appellant, v. ANDREW WU, Appellee.

*Opinion filed April 16, 2020.*

CHIEF JUSTICE ANNE M. BURKE delivered the judgment of the court, with opinion.

Justices Kilbride, Garman, Theis, and Neville concurred in the judgment and opinion.

Justice Karmeier dissented, with opinion.

Justice Michael J. Burke took no part in the decision.

**OPINION**

¶ 1    In this case, we must determine whether the loser of a head-to-head contest on a daily fantasy sports website may recover money lost to the winner of the contest

under section 28-8(a) of the Criminal Code of 2012 (720 ILCS 5/28-8(a) (West 2014)). For the following reasons, we hold that recovery is unavailable.

¶ 2                                           BACKGROUND

¶ 3         On April 4, 2016, the plaintiff, Colin Dew-Becker, filed a complaint in the circuit court of Cook County against the defendant, Andrew Wu. The complaint alleged that plaintiff and defendant had engaged in a daily fantasy sports (DFS) contest on a website known as FanDuel and that, as a result of this contest, plaintiff had lost $100 to defendant. The complaint further alleged that the DFS contest constituted illegal gambling under Illinois law and, therefore, plaintiff was entitled to recover the lost money under section 28-8(a) of the Criminal Code of 2012 (*id.* § 28-8(a)), a statutory provision which allows the loser of certain illegal bets to seek recovery from the winner.

¶ 4         At a bench trial, plaintiff testified that in a DFS contest each participant creates a virtual roster of players by selecting from among current athletes in a real professional or amateur sports league. Each participant then earns fantasy points based on how well the selected athletes perform individually in their actual professional or college sports games on a given day. After all such games are completed, a total score is calculated for each of the virtual rosters, and the winner of the contest is the participant whose roster has the most points. A head-to-head DFS contest is one that involves only two participants who compete against each other directly.

¶ 5         Plaintiff testified that on April 1, 2016, he and defendant each paid a $109 entrance fee to participate in a head-to-head DFS contest on the FanDuel website. The contest involved National Basketball Association (NBA) games, and both plaintiff and defendant selected a fantasy roster of nine NBA players. Plaintiff stated that he understood when entering the contest that the winner would keep $200, the loser would get nothing, and FanDuel would keep $18. Plaintiff testified that defendant won the DFS contest by a score of 221.1 to 96.3 and that defendant received the $200 due him.

¶ 6         Defendant, appearing *pro se*, testified that he did not view the DFS contest as "an illegal gambling situation." He stated that he chose to join the fantasy contest

voluntarily and that he paid the entrance fee knowing that, if he did not win, $100 would go to plaintiff.

¶ 7 At the close of trial, the circuit court rendered judgment in favor of defendant. The court concluded defendant was entitled to judgment as a matter of law because section 28-8(a) "does not allow recovery when the gambling is not connected— conducted between one person and another person, in this case, because of FanDuel."

¶ 8 On appeal, the appellate court affirmed. 2018 IL App (1st) 171675. The appellate court agreed with the circuit court's reading of section 28-8(a), holding that recovery could only be had under the statute when there was a "direct connection between the two persons involved in the wager." *Id.* ¶ 19.

¶ 9 We granted plaintiff's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. July 1, 2018).

¶ 10                                    ANALYSIS

¶ 11 At issue in this case is whether plaintiff can recover money lost in a head-to-head DFS contest under section 28-8(a) of the Criminal Code (720 ILCS 5/28-8(a) (West 2014)). This provision states, in relevant part:

"(a) Any person who by gambling shall lose to any other person, any sum of money or thing of value, amounting to the sum of $50 or more and shall pay or deliver the same or any part thereof, may sue for and recover the money or other thing of value, so lost and paid or delivered, in a civil action against the winner thereof, with costs, in the circuit court." *Id.*

¶ 12 Determining the meaning of section 28-8(a) presents an issue of statutory interpretation, which we consider *de novo*. *People v. Manning*, 2018 IL 122081, ¶ 16. The fundamental rule of statutory interpretation is to ascertain and give effect to the legislature's intent, and the best indicator of that intent is the statutory language, given its plain and ordinary meaning. *People v. Alexander*, 204 Ill. 2d 472, 485 (2003). When the statutory language is clear and unambiguous, it is given effect as written without resort to other aids of statutory interpretation. *Petersen v. Wallach*, 198 Ill. 2d 439, 445 (2002).

¶ 13    The appellate court assumed, *arguendo*, that a head-to-head DFS contest is "gambling" within the meaning of section 28-8(a) (2018 IL App (1st) 171675, ¶ 17) but then went on to conclude that recovery for a loss in such a contest was unavailable under the statute. The court noted that section 28-8(a) references " '[a]ny person' " who loses by gambling " 'to any other person.' " *Id.* ¶ 19 (quoting 720 ILCS 5/28-8(a) (West 2014)). The court reasoned that this language "requires a direct connection between the two persons involved in the wager" for recovery to be allowed. *Id.* In other words, according to the appellate court, section 28-8(a) does not permit recovery when a third-party intermediary has facilitated or aided in the illegal gambling transaction. We disagree.

¶ 14    Courts are not free to read into a statute exceptions, limitations, or conditions the legislature did not express. *Illinois State Treasurer v. Illinois Workers' Compensation Comm'n*, 2015 IL 117418, ¶ 21. The only "direct" connection required under section 28-8(a) is that one person lose at gambling to another. Nothing in the statute states that a third party's help in conducting the gambling eliminates the plaintiff's right to recovery. See *Zellers v. White*, 208 Ill. 518 (1904) (interpreting a predecessor statute of section 28-8(a)). Indeed, reading in such a limitation would effectively eliminate the utility of section 28-8(a). The purpose of section 28-8(a) "is not simply to undo illegal gambling transactions but 'to deter illegal gambling by using its recovery provisions as a powerful enforcement mechanism.' " *United States v. Resnick*, 594 F.3d 562, 571 (7th Cir. 2010) (quoting *Vinson v. Casino Queen, Inc.*, 123 F.3d 655, 657 (7th Cir.1997)). If a gambling winner's liability could be avoided by simply having an agent assist with the gambling transaction in some way, the enforcement mechanism of the statute would essentially be negated.

¶ 15    The appellate court also concluded that section 28-8(a) cannot be read as applying to DFS contests hosted by websites such as FanDuel because, as a practical matter, the statute cannot work when a DFS contest takes place on the Internet. The court noted that FanDuel allows fantasy sports participants to compete in DFS contests using only a screen name rather than their real names and, thus, the loser of a DFS contest will often not know the real identity of the winner. The appellate court concluded that a loser cannot sue the winner "when the winner's identity is known only through a screen name." 2018 IL App (1st) 171675, ¶ 21.

From this, the court determined that DFS contests held on websites such as FanDuel are not covered by section 28-8(a). *Id.* Again, we disagree.

¶ 16    First, it is not always true that DFS participants do not know one another's identities. In this case, for example, plaintiff was clearly aware of defendant's true identity. Plaintiff invited defendant to participate in the DFS contest, and plaintiff's complaint identified defendant by name, even though defendant had used a screen name during the DFS contest itself. *Id.* ¶ 20. Further, even if a defendant's real name is unknown, Illinois Supreme Court rules permit limited pretrial discovery to uncover that name. See Ill. S. Ct. R. 224 (eff. May 30, 2008); *Hadley v. Doe*, 2015 IL 118000. To be sure, the use of screen names may, in some instances, make recovery more difficult for the loser of a DFS contest, but it does not make recovery impossible. Moreover, nothing in the language of section 28-8(a) excludes Internet contests from the statute's reach. We therefore cannot conclude that section 28-8(a) is *per se* inapplicable to DFS contests conducted on websites such as FanDuel.

¶ 17    The appellate court also rejected the application of section 28-8(a) to DFS contests conducted on websites such as FanDuel because, according to the court, allowing such application would open "the floodgates of litigation" to the "thousands of Illinois residents" who have participated in and lost DFS contests. 2018 IL App (1st) 171675, ¶ 22. The appellate court held that it would be "absurd" to conclude the legislature intended to "inundate the court system with such a high volume of claims" (*id.*) and, therefore, section 28-8(a) cannot apply to DFS contests. See, *e.g.*, *Carmichael v. Laborers' & Retirement Board Employees' Annuity & Benefit Fund*, 2018 IL 122793, ¶ 35 (when interpreting statutes, we presume that the legislature did not intend to create absurd results).

¶ 18    The appellate court's conclusion that applying section 28-8(a) to DFS contests would open the floodgates of litigation is speculative. See, *e.g.*, *Sonnenberg v. Amaya Group Holdings (IOM) Ltd.*, 810 F.3d 509, 511 (7th Cir. 2016) (noting that there is typically not a strong incentive for gamblers to file lawsuits to recover gambling losses because the gambler knows his money is at risk). Moreover, it is contradicted by the court's previous discussion regarding the DFS contest participants' use of screen names. As the appellate court itself noted, the fact that participants are known only by screen names would tend to limit the number of lawsuits filed. Further, and most important, section 28-8(a) is meant to encourage

the filing of lawsuits as a means of deterring illegal gambling. Any increase in litigation is therefore not an absurd result but, rather, the explicit purpose of the statute.

¶ 19    Finally, the appellate court observed that "the trend in Illinois is toward more relaxed gambling laws" and that section 28-8(a)'s "relevance and applicability have dwindled since its inception in the late 1800s." 2018 IL App (1st) 171675, ¶¶ 25-26. The court concluded for this reason, too, that section 28-8(a) should not be applied to DFS contests hosted on websites such as FanDuel.

¶ 20    It is certainly true that the "era of strong opposition" to gambling in Illinois has passed (*Sonnenberg*, 810 F.3d at 510) and, with the recent enactment of the Sports Wagering Act (Pub. Act 101-31, § 25-5 (eff. June 28, 2019) (adding 230 ILCS 45/25-1 *et seq.*)), legalized gambling has been significantly expanded.[1] However, section 28-8(a) remains the law. In the absence of any constitutional infirmity, it is not the role of the judiciary to declare the statute may not be enforced.

¶ 21    Although we do not find the appellate court's reasoning persuasive, we nevertheless agree that the judgment of the appellate court should be affirmed because the DFS contest at issue here was not gambling. In order to recover under section 28-8(a), plaintiff must establish that he lost his money while "gambling." Section 28-1(a)(1) of the Criminal Code of 2012 states that a person commits gambling if he or she "knowingly plays a game of chance or skill for money or other thing of value, unless excepted in subsection (b) of this Section." 720 ILCS 5/28-1(a)(1) (2014). Subsection (b)(2), in turn, provides an exception to gambling for a participant in any contest that offers "prizes, award[s] or compensation to the actual contestants in any bona fide contest for the determination of skill, speed, strength or endurance or to the owners of animals or vehicles entered in such contest." *Id.* § 28-1(b)(2). In this case, there is no question that when plaintiff and defendant entered into the DFS contest, they were "actual contestants" who had before them a possible "prize," "award," or "compensation." The question is whether plaintiff and defendant were engaged in a "bona fide contest for the determination of skill."

[1]The Sports Wagering Act does not address or regulate DFS contests.

- 6 -

¶ 22    Answering this question can present difficulties because the outcome of every contest depends, at least to some degree, on chance. Even chess, a highly skill-based contest, can be affected by the random factors of who draws white (and thus goes first) or whether one's opponent is sick or distracted. To address these difficulties and determine whether a contest is one of skill and, hence, exempt from gambling laws, courts have applied three general tests. See Marc Edelman, *Regulating Fantasy Sports: A Practical Guide to State Gambling Laws, and a Proposed Framework for Future State Legislation*, 92 Ind. L.J. 653, 663-65 (2017). The first test, and the one adopted by the majority of courts, is typically referred to as the "predominant purpose test" or "predominate factor test" *Id.* at 663; see, *e.g.*, *Joker Club, LLC v. Hardin*, 643 S.E.2d 626 (N.C. Ct. App. 2007). Under this test, contests in which the outcome is mathematically more likely to be determined by skill than chance are not considered gambling. Edelman, *supra*, at 663 n.46. As one court has put it,

> "[t]he test of the character of the game is, not whether it contains an element of chance or an element of skill, but which is the dominating element that determines the result of the game, or, alternatively, whether or not the element of chance is present in such a manner as to thwart the exercise of skill or judgment." (Internal quotation marks omitted.) *O'Brien v. Scott*, 89 A.2d 280, 283 (N.J. Super. Ct. Ch. Div. 1952).

¶ 23    A second test used to differentiate between contests of skill and gambling is called the "material element test." Edelman, *supra*, at 664. Under this test, a contest is considered a game of chance if the outcome depends in a material degree upon an element of chance, even if skill is otherwise dominant. See, *e.g.*, *Thole v. Westfall*, 682 S.W.2d 33, 37 n.8 (Mo. Ct. App. 1984) (explaining "chance must be a material element in determining the outcome of a gambling game. It need not be the *dominant* element." (Emphasis in original.)).

¶ 24    The third test is the "any chance test." Edelman, *supra*, at 663 n.46. As its name suggests, this test finds a contest to be gambling if it involves any chance whatsoever. *Id.* at 664.

¶ 25    This court has not previously adopted any of the three recognized tests for determining whether a contest is one of skill or chance. We find, however, that the predominate factor test is the most appropriate. The any chance test is essentially

no test at all, as every contest involves some degree of chance. The material element test depends too greatly on a subjective determination of what constitutes "materiality." The predominate factor test, in contrast, provides a workable rule that allows for greater consistency and reliability in determining what constitutes a contest of skill. Notably, too, our legislature has used the predominate factor test in other, similar contexts. See 720 ILCS 5/28-2(a)(4)(A) (West 2018) (excluding an amusement device known as a "redemption machine" from the definition of a gambling device if the "outcome of the game is predominantly determined by the skill of the player").

¶ 26 At issue then is whether head-to-head DFS contests are predominately determined by the skill of the participants in using their knowledge of statistics and the relevant sport to select a fantasy team that will outperform the opponent. Several recent, peer-reviewed studies have established that they are. Daniel Getty et al., *Luck and the Law: Quantifying Chance in Fantasy Sports and Other Contests*, 60 SIAM Rev. 869 (2018); Brent A. Evans et al., *Evidence of Skill and Strategy in Daily Fantasy Basketball*, 34 J. Gambling Stud. 757 (2018); Todd Easton & Sarah Newell, *Are Daily Fantasy Sports Gambling?* 5 J. of Sports Analytics 35 (2019).[2] In particular, it has been shown that "skill is always the dominant factor" in head-to-head DFS contests involving NBA games. Getty, *supra*, at 882 & fig. 6; see also, generally, Jeffrey C. Meehan, *The Predominate Goliath: Why Pay-to-Play Daily Fantasy Sports Are Games of Skill Under the Dominant Factor Test*, 26 Marq. Sports L. Rev. 5 (2015). Indeed, the fact that DFS contests are predominately skill-based is not only widely recognized to be true but has created a potential revenue problem for the DFS websites. Because skilled players can predominate the DFS contests, new and unskilled players are often hesitant to participate. Ed Miller & Daniel Singer, *For Daily Fantasy Sports Operators, the Curse of Too Much Skill*, Sports Bus. J., (July 27, 2015).

¶ 27 Arguing for a different result, plaintiff points to an Illinois Attorney General opinion letter that concluded DFS contests are illegal gambling under Illinois law.

_____

[2]A recent decision from the intermediate court of New York has recognized the role of skill in determining the outcome of DFS contests, noting that research has "demonstrated that lineups chosen by actual contestants beat those chosen at random and contestants improve their performance over time." *White v. Cuomo*, No. 528026, 2020 WL 572843, at *4 (N.Y. App. Div. Feb. 6, 2020). The decision concluded, however, that such contests are games of chance under the material element test.

See 2015 Ill. Att'y Gen. Op. No. 15-006. However, that opinion did not have the benefit of the more recent research that has established the predominance of skill in DFS contests. Moreover, the opinion relied heavily on a decision from the Texas Attorney General's Office, Tex. Att'y Gen. Letter Op. LO-94-051 (June 9, 1994). Texas employs the any chance test, not the predominate factor test. See *State v. Gambling Device*, 859 S.W.2d 519, 523 (Tex. App. 1993).

¶ 28     Because the outcomes of head-to-head DFS contests are predominately skill based, we conclude that plaintiff was not engaged in "gambling" with defendant as required under section 28-8(a). In so holding, we note that nothing in this opinion should be read as stating that regulation of DFS contests is unnecessary or inappropriate. That determination is for the legislature. We determine here only that the DFS contest at issue in this case does not fall under the current legal definition of gambling. For this reason, we affirm the judgment of the appellate court.

¶ 29                              CONCLUSION

¶ 30     For the foregoing reasons, the judgment of the appellate court, which affirmed the judgment of the circuit court, is affirmed.

¶ 31     Affirmed.

¶ 32     JUSTICE KARMEIER, dissenting:

¶ 33     Loss recovery statutes, such as section 28-8 of the Criminal Code of 2012 (720 ILCS 5/28-8(a) (West 2014)), are an enforcement mechanism "designed to punish and discourage" gambling by making gambling activities unprofitable. *Johnson v. McGregor*, 157 Ill. 350, 353 (1895). Throughout the history of antigambling laws, courts have recognized the effort and ingenuity man has exerted to circumvent the law by disguising activities as legal or contests of skill although the intended appeal is to chance—"to the hope, of winning by shrewd and lucky guessing disproportionately more than the contestant has put into the enterprise." *State v. Globe-Democrat Publishing Co.*, 110 S.W.2d 705, 716-17 (Mo. 1937) (*en banc*); see also *Schneider v. Turner*, 130 Ill. 28, 42 (1889) (certain contracts may be a mere

disguise for gambling); *Morrow v. State*, 511 P.2d 127, 129 (Alaska 1973). Due to its misconception of the predominate factor test,[3] the ingenuity exerted in head-to-head DFS contests duped the majority into believing it is a game of skill when it truly is a game of chance. Therefore, I dissent.

¶ 34        In its opinion, the majority soundly rebuts the appellate court's analysis regarding the applicability of section 28-8 to games that are played by many over the Internet and involve a third-party intermediary. Following suit with many other jurisdictions, the majority adopts the predominate factor test to determine whether section 28-8 is nevertheless applicable to DFS contests. It then properly asserts the fundamental inquiry of the predominate factor test that " '[t]he test of the character of the game is, not whether it contains an element of chance or an element of skill, but which is the dominating element that determines the result of the game, or, alternatively, whether or not the element of chance is present in such a manner as to thwart the exercise of skill or judgment.' " *Supra* ¶ 22 (quoting *O'Brien v. Scott*, 89 A.2d 280, 283 (N.J. Super. Ct. Ch. Div. 1952)). To this extent, I agree. In applying the predominate factor test to a DFS contest, however, the majority oddly ignores its own statement of the test and finds DFS is a contest of skill based on the results of statistical studies.

¶ 35        From the outset, I must highlight the impropriety of the majority's reliance on scientific studies—that are not found in the record or in either party's briefs—to make the factual determination that skill is the predominate factor in a contest. While defendant's brief presents a bare assertion that DFS was a game of skill, he fails to support this contention with any authority. Because the studies were not presented at any stage of this litigation, reliance on these studies raises " ' "concerns about witness credibility and hearsay normally associated with citations to empirical or scientific studies whose authors cannot be observed or cross-examined." ' " See *In re Commitment of Simons*, 213 Ill. 2d 523, 532 (2004) (quoting *People v. Miller*, 173 Ill. 2d 167, 205 (1996) (McMorrow, J. specially concurring), quoting *Jones v. United States*, 548 A.2d 35, 42 (D.C. 1988)). The

---

[3]Courts have ascribed different names to this test. Common names include the "dominant factor test" and "predominate factor test." *Banilla Games, Inc. v. Iowa Department of Inspections & Appeals*, 919 N.W.2d 6 (Iowa 2018); *Joker Club, LLC v. Hardin*, 643 S.E.2d 626 (N.C. Ct. App. 2007). Although "dominant factor test" seems more grammatically appropriate, for the sake of clarity, I will follow the majority and refer to the test as the "predominate factor test."

majority should not take the position of an advocate and defend against plaintiff's suit by hastily accepting the validity of studies that it searched for outside the record (see *People v. Givens*, 237 Ill. 2d 311, 324 (2010)), especially considering the majority failed to engage in its own analysis of the studies' validity or credibility. The injustice resulting from this mistake is exceedingly apparent considering that, under a proper predominate factor analysis, the evidence presented at trial proved that the contest here is clearly a game of chance.

¶ 36    Seemingly, the majority was misled by the authority it references, *O'Brien*. In determining that the contest at issue was gambling, the *O'Brien* court primarily discussed the findings of a study conducted by an expert witness, who testified in the trial court. See *O'Brien*, 89 A.2d 280. But, four years later, the same court found *O'Brien* was no longer authoritative in light of the subsequent New Jersey Supreme Court decisions, which collectively have held the test is whether the results predominately depend on chance regardless if skill predominates in the process. *Ruben v. Keuper*, 127 A.2d 906, 909-10 (N.J. Super. Ct. Ch. Div. 1956). Such analysis is considered a qualitative approach.

¶ 37    Like New Jersey, the vast majority of predominate factor jurisdictions have adopted a qualitative approach. *In re Request of the Governor for an Advisory Opinion*, 12 A.3d 1104, 1112-13 (Del. 2009); *Morrow*, 511 P.2d at 129; *Seattle Times Co. v. Tielsch*, 495 P.2d 1366, 1369 (Wa. 1972) (*en banc*); *Commonwealth v. Plissner*, 4 N.E.2d 241, 244-45 (Mass. 1936); *Globe-Democrat Publishing Co.*, 110 S.W.2d at 717 (synthesizing cases from all jurisdictions); see also *Banilla Games, Inc. v. Iowa Department of Inspections & Appeals*, 919 N.W.2d 6, 10 (Iowa 2018); *Opinion of the Justices*, 795 So. 2d 630, 641 (Ala. 2001); *Lucky Calendar Co. v. Cohen*, 120 A.2d 107, 113 (N.J. 1956); *Commonwealth v. Laniewski*, 98 A.2d 215, 217 (Pa. Super. Ct. 1953); *State v. Stroupe*, 76 S.E.2d 313, 317 (N.C. 1953); *Steely v. Commonwealth*, 164 S.W.2d 977, 979-80 (Ky. 1942). A review of these jurisdictions clarifies that, to be a contest of skill, the participant's efforts or skill must control the final result, not just one part of the larger scheme. If chance can thwart the participant's efforts or skill, it is a game of chance. "It is the character of the game, and not the skill or want of skill of the player, which determines whether the game is one of chance or skill." (Internal quotation marks omitted.) *Stroupe*, 76 S.E.2d at 317; see also *Globe-Democrat Publishing Co.*, 110 S.W.2d at 717; *Laniewski*, 98 A.2d at 217.

¶ 38 Although scientific studies may aid in this determination, under the qualitative approach, games or contests whose outcome depends on the results of a contingent event out of the participant's control, like DFS, are games of chance as a matter of law. See *In re Advisory Opinion to the Governor*, 856 A.2d at 328-29; *Opinion of the Justices*, 795 So. 2d at 641. This is so because predictions, regardless of the likelihood of being true, are mere guesses innate with chance. *Opinion of the Justices*, 795 So. 2d at 641. The knowledge of past records, statistics, contest rules, and other information can increase a participant's chances of correctly predicting the result of the event, but it cannot control the outcome, as no amount of research or judgment can assure a certain result will occur. *Laniewski*, 98 A.2d at 217. No one knows what may happen once the event commences. "What a man does not know and cannot find out is chance to him, and is recognized as chance by the law." *Dillingham v. McLaughlin*, 264 U.S. 370, 373 (1924). Thus, skill can improve or maximize the potential for winning in such contests, but it cannot determine the outcome. *Commonwealth v. Dent*, 2010 PA Super 47, ¶ 22.

¶ 39 While the issue of what constitutes a *bona fide* game of skill is one of first impression, viewing article 28 of the Criminal Code of 1961 (720 ILCS 5/art. 28 (West 2014)) as a whole, the legislature's intent supports the adoption of a qualitative approach. In construing a statute, our primary objective is to ascertain and give effect to the intent of the legislature. *People v. Goossens*, 2015 IL 118347, ¶ 9. The most reliable indicator of such intent is the plain and ordinary meaning of the statutory language itself. *Id.* We consider the statute in its entirety, keeping in mind the subject it addresses and the apparent intent of the legislature in enacting it. Further, the meaning of phrases should be ascertained by reference to the meaning of the surrounding words and phrases. *People ex rel. Madigan v. Wildermuth*, 2017 IL 120763, ¶ 17.

¶ 40 After providing the general prohibition of games of chance or skill for money, section 28-1 lists specific activities that constitute gambling, including activities regarding lotteries, bingos, and raffles; "knowingly mak[ing] a wager upon the result of any game [or] contest"; "knowingly sell[ing] pools upon the result of any game or contest of skill"; and "knowingly establish[ing], maintain[ing], or operat[ing] an Internet site that permits a person to *** make a wager upon the result of any game [or] contest." 720 ILCS 5/28-1(a)(2), (6), (7), (9), (10), (12) (West 2014). Similar activities are prohibited by section 28-1.1, which concerns

syndicated gambling.[4] *Id.* § 28-1.1. In itemizing what activities meet an element of one type of syndicated gambling, the provision includes acceptance of wagers or bets upon the result of any contests of skill or upon any "unknown or contingent event whatsoever." *Id.* § 28-1.1(d). Section 28-1.1 also provides, nearly verbatim, the same exception as section 28-1(b)(2), upon which the majority relies. *Id.* § 28-1.1(e)(2).

¶ 41    Considering that all prohibited activities enumerated in sections 28-1 and 28-1.1 involve outcomes that depend on a contingent event out of the participants' control, the legislature demonstrated its intent to broadly prohibit activities of that nature. The "*bona fide* contest for the determination of skill" must therefore not encompass games of this nature. *Rushton v. Department of Corrections*, 2019 IL 124552, ¶ 19 ("a fundamental principle of statutory construction is that all provisions of an enactment should be viewed as a whole and words and phrases should be read in light of other relevant provisions of the statute").

¶ 42    It is true that every game, to some extent, involves chance or an unknown. Nevertheless, no court would doubt that a person participating in a simple human footrace is a game of skill. The critical distinction between a game of chance and a game of skill is the participant's ability to overcome chance with superior skill. *Dent*, 2010 PA Super 47, ¶ 23; *Joker Club, L.L.C. v. Hardin*, 643 S.E.2d 626, 630-31 (N.C. Ct. App. 2007); see also *Lucky Calendar Co.*, 120 A.2d at 113. Runners can train for severe weather, divert their routes to avoid competitors, or increase their speed to make up for lost time. But a person who places a wager on the race lacks any ability to control the outcome of the race. It is this type of chance inherent in a game, which a person cannot influence, that contributes to the undeniable evils at which antigambling statutes are aimed. See *supra* ¶ 14; see also *Globe-Democrat Publishing Co.*, 110 S.W.2d at 717; *Zellers v. White*, 208 Ill. 518, 526-27 (1904). Thus, the exemption under section 28-1(b)(2) may apply only to contests in which the participant's own skill has the opportunity to overcome chance.

¶ 43    The majority's quantitative approach lacks the foresight to distinguish an activity tactfully camouflaged as a game of skill but whose outcome relies on a contingent event out of the participant's control from an activity in which the

---

[4]Syndicated gambling regards the interplay of gambling and other organized crime. See 720 ILCS 5/28-1.1(a) (West 2014).

- 13 -

participant can use his or her skill to overcome any impact chance may have on the outcome. Besides the downfalls intrinsic in statistical studies,[5] their conclusions are often premised on data showing how many times a skilled player wins over the course of many rounds of the game, which—at most—can only theoretically prove if skill is involved, and to what extent, in the entire gambling scheme. Such studies lack conditions or controls necessary to limit the data or analysis to the impact of skill or chance on the outcome of a contest.

¶ 44    As a result, the majority opinion risks legalizing traditional concepts of gambling anytime a study concludes that it involves skill more than chance. One example is poker. Our courts, like many other courts, have determined poker and other card games to be games of chance despite statistical evidence that skill dominates. *People v. Mitchell*, 111 Ill. App. 3d 1026, 1028 (1983) (poker); *People v. Dugan*, 125 Ill. App. 3d 820, 827-28 (1984) (blackjack), *rev'd in part on other grounds*, 109 Ill. 2d 8 (1985); *Dent*, 2010 PA Super 47, ¶¶ 11-23 (collecting cases on poker, electronic poker, slot machines, dice games, shell games, and Keno; concluding poker is a game of chance). Under the majority's opinion, however, because studies show skill dominates in poker, these cases are effectively overruled, and poker is now legal. This absurd result could not have been intended by the legislature. See *People v. Webb*, 2019 IL 122951, ¶ 17.

¶ 45    On the other hand, a qualitative approach focuses on what truly controls the outcome of the activity. As such, it provides a better framework to parse out activities that were intended to be prohibited by article 28.

¶ 46    Applying the proper standard here, a DFS contest is a game of chance. Once a lineup is set and the athletic games commence, the DFS participant cannot influence the athlete's performance or how points are accumulated. At this point in the game, the outcome of the contest relies entirely on a contingent event that the participant

_____

[5]For example, the Delaware Supreme Court, in assessing whether sports lotteries would qualify as games of pure chance under the state constitution, "emphasize[d] that wide areas of disagreement exist between studies, and internal inconsistencies within studies, addressing single game betting and the issue of whether chance or skill predominates." *In re Request of the Governor for an Advisory Opinion*, 12 A.3d at 1114; see also Jonathan Bass, *Flushed From the Pocket: Daily Fantasy Sports Businesses Scramble Amidst Growing Legal Concerns*, 69 SMU L. Rev. 501, 514-16 (2016).

lacks all control over, and there is no subsequent opportunity for the participant to overcome the chance involved. Accordingly, a DFS contest is a game of chance.

¶ 47    It should be noted, however, that the legislature has since authorized sports wagering, through its enactment of the Sports Wagering Act (Act) (Pub. Act 101-31 (eff. June 28, 2019) (adding 230 ILCS 45/25-1 *et seq.*)). Although the Act does not explicitly reference daily fantasy sports, it defines "sports wagering" as "accepting wagers on sports events or portions of sports events, or on the individual performance statistics of athletes in a sports event or combination of sports events, by any system or method of wagering, including, but not limited to, in person or over the Internet through websites and on mobile devices." *Id.* (adding 230 ILCS 45/25-10). Therefore, contrary to the majority's contention (*supra* ¶ 20 n.1), because daily fantasy sports requires a wager in an attempt to accumulate the most points based on the individual performance statistics of athletes in a combination of sport events over the Internet, the Act clearly governs daily fantasy sports. While the Act has no bearing on this case, the ability to recover losses from DFS contests, when played in accordance with the Act, has now come to an end. Pub. Act 101-31 (eff. June 28, 2019) (adding 720 ILCS 5/28-1(b)(15)).

¶ 48    For the reasons stated above, I respectfully dissent.

¶ 49    JUSTICE MICHAEL J. BURKE took no part in the consideration or decision of this case.