2025 IL App (2d) 240487-U
No. 2-24-0487
Order filed March 6, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| BENJAMIN GESKE, | ) | Appeal from the Circuit Court, |
| | ) | of McHenry County. |
| Plaintiff-Appellee and | ) | |
| Cross-Appellant, | ) | |
| | ) | |
| v. | ) | No. 24-OP-859 |
| | ) | |
| JAMIE DUPAW GESKE, | ) | Honorable |
| | ) | Jennifer L. Johnson, |
| Defendant-Appellant and | ) | Judge, Presiding. |
| Cross-Appellee. | ) | |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices McLaren and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in finding Defendant-Appellant abused the minor child by way of intimidation, where she pushed Plaintiff-Appellee and the minor child witnessed the pushing. The trial court did not err in granting Defendant-Appellant parenting time under the plenary order of protection. Affirmed.

¶ 2    At issue in this appeal is whether the trial court erred when it granted Benjamin's petition for an order of protection against Jamie, on the basis that she "intimidated" their 14-year-old child, C.G. Appellee, Benjamin filed a cross-appeal, arguing that the trial court erred when it granted Jamie unrestricted parenting time with the minor child, C.G. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On July 25, 2024, Benjamin filed a petition for an emergency order of protection against Jamie, alleging four separate instances of abuse between May 2, 2024, and July 24, 2024. Benjamin alleged that on May 2, 2024, Jamie hit him with a spatula on the right side of the head while screaming at him. She then tried to push Benjamin out the door and threatened to have others come over and harm him. C.G. witnessed this incident. Benjamin alleged that on July 16, 2024, Jamie came into his room, accused him of sleeping with customers, called him a pedophile, and spat in his face. C.G. overheard this incident. Benjamin alleged that on July 22, 2024, Jamie told him that he would never see C.G. again, which C.G. overheard. Benjamin alleged that on July 24, 2024, he returned home to an argument between Jamie and C.G. Jamie screamed at Benjamin, saying that C.G. was "a piece of shit like him" and called Benjamin a "deadbeat dad." When Benjamin called the police, Jamie would not let him or C.G. leave the house. Once they were able to leave, Jamie sent harassing text messages to Benjamin. In the order of protection, Benjamin also generally alleged that Jamie had two or more guns in her possession, in violation of the pretrial release order entered in case no. 24-DV-122.

¶ 5     Based on the allegations in the petition, an emergency order of protection entered on July 25, 2024, naming Benjamin and C.G. as protected persons. A hearing on a final protective order was scheduled for August 8, 2024. We summarize the testimony relevant to this appeal and cross-appeal below.

¶ 6     At the hearing, Benjamin called Jamie as his first witness. She testified as follows. Regarding the May 2, 2024, incident, Jamie asserted her Fifth Amendment right. Regarding the July 16, 2022, incident, she intermittently asserted her Fifth Amendment right. She did testify that at approximately 10:45 PM, Benjamin was in his room, laying down. She accused him of sleeping

with customers, repeating a situation Benjamin had advised her of earlier. Benjamin was reprimanded at work for the situation. To Jamie's knowledge, C.G. did not overhear this interaction. Jamie did not recall any incident occurring on July 22, 2024. Finally, regarding the July 24, 2024, incident, Jamie denied having an argument with C.G. Rather, she categorized it as an "interaction." Benjamin entered the room after the interaction had ended, according to Jamie. She denied calling C.G. a "piece of shit" and an "abuser" during the interaction. She also denied calling Benjamin a "deadbeat dad," a "woman abuser," and telling him that C.G. was "learning it from him." She testified that she instead told Benjamin that C.G. was "learning this behavior from your actions." When Benjamin and C.G. called the police and ultimately left the house, Jamie did not try and stop them from doing so. Nor did she refuse to allow the police to enter the residence or prevent C.G. from speaking with them. Once Benjamin and C.G. had left, she had sent Benjamin a few text messages. When asked if the number of text messages sent was approximately 20, she said she could not recall.

¶ 7    Benjamin was called as a witness next. He testified as follows. He had been married to Jamie Geske for 17 years and together they have a 14-year-old child, C.G. Regarding the May 2, 2024, incident, Jamie "slapped [him] upside the head" with a spatula while they were both in the kitchen of their shared home. He then called 9-1-1, which made Jamie very angry. She called her mother and put her on speakerphone. Jamie's mother tried to convince Benjamin not to continue his call with 9-1-1. Jamie was also trying to have Benjamin end the call. Benjamin entered the bathroom in an attempt to get some space. He then left the bathroom to check on C.G. Jamie then tried to push Benjamin out the back door with one hand. Benjamin then proceeded to the front of the house, as he had seen C.G come downstairs. Jamie followed and attempted to shove Benjamin out of the front door with one hand. C.G was sitting in the front room at this point. During the

altercation, Jamie was threatening to call her friends, Matt and Bo, over to the house. Benjamin took this as a physical threat.

¶ 8     Regarding the July 16, 2024, incident, Benjamin testified that at approximately 10:45 PM, he was lying in his bedroom watching television. Jamie came in, accusing him of sleeping with his customers and threatening to make a complaint to his company. Benjamin asked her to leave and she called him a pedophile. Benjamin then asked for her to get away from him, as she was getting saliva on his face. She then proceeded to spit in his face. C.G. overheard this altercation, as he was in his bedroom across the hall.

¶ 9     Regarding the July 22, 2024, incident, Benjamin testified that at approximately 9:00 PM, he was lying in his bed with the door to his bedroom locked. Jamie knocked on the door, and told Benjamin that he would never see C.G. again.

¶ 10     Finally, regarding the July 24, 2024, incident, Benjamin testified that at approximately 5:45 PM, Benjamin had returned home from work. He entered through the front door and observed C.G. sitting on the couch in the living room and Jamie standing between the couch and the wall. Jamie was screaming at C.G. when Benjamin entered but started screaming at Benjamin when she noticed he was there. She said C.G. had put his hands on her and that he was a woman abuser like his father. She also called Benjamin a "deadbeat dad" and a "piece of shit." Benjamin then tried to separate C.G. from Jamie to deescalate the situation. He attempted to leave the house, but Jamie told him that wasn't allowed. She also pushed the door close when Benjamin attempted to open it to leave. He then called 9-1-1.

¶ 11     The police arrived at the home and Jamie exited through the front door. She did not allow the police to enter the home. Benjamin followed behind her with C.G. Benjamin spoke with the officers for approximately 10-15 minutes and then they left. He then took C.G. to dinner. During

dinner, Jamie texted Benjamin approximately 25-28 times. Her texts were threatening in nature, saying she was going to report Benjamin for kidnapping if he did not bring C.G. home within one hour.

¶ 12    C.G. was called to testify next. He testified as follows. Regarding the May 2, 2024, incident, he was upstairs in his bedroom when he first started to hear his parents argue. He then came downstairs. Eventually, his parents left the kitchen where they had been arguing. C.G. then saw Jamie push Benjamin with one hand, trying to push him out the front door of the house. He did not recall her saying anything as she did this. C.G. started to testify regarding the July 22, 2024, incident, but the trial court stopped testimony for the day and continued the hearing until August 15, 2024.  The emergency order of protection was extended until that date as well.

¶ 13    On August 15, 2024, C.G. continued his testimony as follows. On July 24, 2024, he was in his room and Jamie came in, took his phone, and told him to go to her room because she had some important news. He wasn't comfortable going with her at the time, so he proceeded to take a shower instead. After, Jamie knocked on C.G.'s door and told him that it was disrespectful of him not to go to her room. C.G. then went downstairs to eat. Jamie followed him and attempted to talk to him about his half-sister. C.G. tried to leave, but Jamie blocked him with her hand on his chest. Jamie was on the phone with her mother at this point. C.G. removed her hand from his chest. Jamie reacted to this by yelling into her phone that C.G. had shoved her into a wall, that he was a woman abuser, that he must have learned it from his dad, and called C.G. a "piece of shit." C.G. denied pushing Jamie.

¶ 14    Benjamin then entered the room and tried to assess the situation. Jamie then began yelling at Benjamin instead of C.G. Because Jamie would not give Benjamin an answer as to what was going on, he called the police. When the police arrived, Jamie would not let them into the house,

so C.G. and Benjamin had to go outside to talk to the police. After Benjamin and C.G spoke to the police separately, they then let Benjamin and C.G. leave, but Jamie tried to prevent them from doing so. She stood in front of the car until the police officers yelled at her to get inside the house.

¶ 15   C.G. further testified that during this altercation he felt scared. He didn't know what Jamie was going to do next—whether she would get physical or maybe even have him arrested. C.G. recalled two instances when Jamie had previously been physical with Benjamin: when Jamie hit Benjamin with a spatula and when she tried to shove him out of the house.

¶ 16   At this point, Benjamin's counsel rested. Jamie's counsel then called Benjamin as an adverse witness. He testified as follows. Regarding the May 2, 2024, incident, he did not push Jamie prior to her hitting him with a spatula. He also testified again that Jamie threatened to bring over her friends Matt and Bo, which he took as a threat of physical violence as one of them is a Green Beret. When presented with his May 2, 2024, statement to the Woodstock police, he acknowledged that he did not include information about that threat.

¶ 17   The matter concluded for the day and was continued until August 19, 2024. Benjamin's testimony continued as follows. To his knowledge, Jamie had access to two guns. This made him fear for his safety.

¶ 18   Jamie was called to testify next. She testified as follows. Regarding the July 24, 2024, incident, C.G. pushed her before Benjamin entered the room. She denied calling C.G. a "piece of shit" at any time during this incident. After reviewing Defendant's Exhibit 1, text messages between Jamie and Benjamin from July 24, 2024, she confirmed that she had sent Benjamin 29-30 text messages after the incident, while Benjamin was taking C.G. to dinner.

¶ 19    Jamie also testified generally that she, not Benjamin, was the primary caretaker of C.G. She drove C.G. to school 90% of the time, she did almost all of the cooking, she registered C.G. for sports and other activities.

¶ 20    The parties then proceeded to closing argument. The trial court took the matter under advisement and the case was continued until August 21, 2024, for decision.

¶ 21    The trial court did not find abuse as to the July 22 or July 24 incidents, but did find abuse as to the May 2 and July 16 incidents, stating as follows:

> "I am going to grant the petition for a plenary order. The May 2nd, 2024 interaction was described by two witnesses, [C.G] and Ben. Jamie pled the 5th on that, as to the events that happened then. But the Court does have evidentiary support for the claims that were made that is by a preponderance of the evidence proving abuse on that date by way of Ben's testimony, a strike to the back of the head or neck with a spatula, and then also Ben's testimony with respect to pushing out of the home, and then [C.G.]'s testimony with respect to what he saw pushing out -- pushing of Ben.
>
> So that physical abuse, knowing or reckless use of physical force, has been shown there with that testimony. The Court also does draw a negative inference with respect to pleading the 5th, understanding the very difficult situation that that places someone in when there is a pending criminal charge.
>
> There is also intimidation of a dependent at that time on the May 2nd event. So when [C.G] witnessed the physical abuse of Ben via the pushing, that is subjecting the minor to witness physical force against another and meets the

definition of intimidation of a dependent, which is meeting the statutory definition of abuse under the statute.

\*\*\*

[T]he Court believes that the events that I have recited from May 2nd have been proven by a preponderance of the evidence, notwithstanding those issues with credibility on those other points.

And then continuing on the July 16th event, this is in short form the spitting incident. And the Court is convinced having listened to the evidence, having watched the parties testify, that there actually was spitting into the face, and that would also -- that is by Respondent to Petitioner. So Jamie spitting on and in Ben's face, and not simply spit that happens part of conversation because you are chatting with somebody really close, but a true spit. So that again qualifies as abuse under the statute."

¶ 22    The written order named Benjamin and C.G. as protected parties; awarded Benjamin physical care, custody, and temporary significant decision-making responsibility of C.G.; and included the following language: "Respondent may have non-harassing, non-abusive contact with the minor protected party and is permitted parenting time as outlined herein. Respondent may have non-harassing, non-abusive contact with petitioner concerning the minor on Our Family Wizard. Neither party shall speak to [C.G.] about the litigation." Jamie was granted parenting time alternating weekends from Friday after school through Sunday at 8:00 PM, and every Wednesday from after school until 8:00 PM. The order indicated that "[i]n her parenting time, [she] shall ensure [C.G] attends all scheduled practices and games, and she may be present for all such events and

her presence and proximity to [C.G] is not a violation of the plenary order of protection." It also provided instructions as to how drop-off and pick-up of C.G. would occur:

> "Jamie *** shall coordinate pick-up of the child with the child by communicating with him by cell phone call or text or video conference, and such communication is not a violation of the plenary order.

> At the end of Jamie['s] *** parenting time, she shall transport the child back to the marital residence *** and Jamie shall remain her vehicle as [C.G.] exits her car, and Benjamin *** shall not be present outside or in the driveway until Jamie leaves. Jamie *** shall leave after the minor exist her vehicle and has entered the residence."

Per the trial court's oral findings, text, call, and videoconference communication between C.G. and Jamie was limited to coordinating pick-up and drop-off. Finally, the order indicated that it would end upon resolution of the parties' divorce (either judgment of dissolution or dismissal) in case no. 24-DC-302.

¶ 23    On August 23, 2024, Jamie filed her notice of appeal. On August 27, 2024, Benjamin filed his notice of cross-appeal.

¶ 24    On December 13, 2024, Jamie filed a motion to modify the plenary order of protection. By agreement, the order of protection was modified on December 20, 2024, to adjust Jamie's parenting time to alternating weekends from Friday at 6:30 PM until 7:00 PM on Sunday, and every Wednesday from 5:00 PM until 8:00 PM. The modified order also permitted Jamie reasonable communication with C.G. and C.G.'s service providers (including school and healthcare); granted Jamie access to C.G.'s school and health records; identified C.G.'s school as no longer being a protected place; granted Benjamin exclusive holiday parenting time from

December 20, 2024, to January 2, 2025; and ordered the parties to cooperate to find a mental health provider for C.G.

¶ 25                                II. ANALYSIS

¶ 26    Jamie argues in her appeal that the trial court erred when it found that she had intimidated C.G., because although the trial court found that the May 2, 2024, incident constituted abuse of Benjamin, there was no additional evidence that she had "subjected" C.G. to participate in or witness that abuse. Benjamin disagrees, and further argues in his cross-appeal that the trial court erred in granting Jamie "unrestricted parenting time" as she had abused C.G. For the following reasons, we disagree with both Jamie and Benjamin and we affirm the judgment of the trial court.

¶ 27    First, we address Jamie's argument— that the trial court erred when it found that she had abused C.G. by way of intimidation. A reviewing court will reverse a finding of abuse only if it is against the manifest weight of the evidence. *Maurissa J.B. v. Ingrida K.*, 2019 IL App (2d) 190107, ¶ 41. A decision is against the manifest weight of the evidence when the opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence. *Indeck Energy Services, Inc. v. DePodesta*, 2021 IL 125733, ¶ 56. To the extent that Jamie's argument requires us to engage in statutory interpretation, our review is *de novo*. *Dew-Becker v. Wu*, 2020 IL 124472, ¶ 12.

¶ 28    Section 103 of the Illinois Domestic Violence Act of 1986 defines "abuse" as "physical abuse, harassment, intimidation of a dependent, interference with personal liberty or willful deprivation but does not include reasonable direction of a minor child by a parent or person *in loco parentis*." 750 ILCS 60/103(1) (West 2024).

¶ 29    Section 103(10) of the Act defines "intimidation of a dependent" as:

"subjecting a person who is dependent because of age, health or disability to participation in or the witnessing of: physical force against another or physical confinement or restraint of another which constitutes physical abuse as defined in this Act, regardless of whether the abused person is a family or household member." *Id.* § 60/103(10).

¶ 30　Jamie argues that in order to "subject" a minor to witness physical force, there must be more evidence than a mere witnessing of abuse. Rather, there must be some evidence of "subjection." Jamie acknowledges that the term "subjecting" is not defined under the Act and then goes onto state that "we can conclude that it is more than the fact that a dependent witnessed an act of abuse, and that 'subjecting' is more than the act of abuse witnessed." She offers virtually no support for this conclusion.

¶ 31　It is well established that our primary goal in statutory interpretation is to ascertain and give effect to the legislature's intent, and the best indicator of that intent is the plain and ordinary meaning of the statutory language. *Dew-Becker*, 2020 IL 124472, ¶ 12 (citing *People v. Alexander*, 204 Ill. 2d 472, 485). Here, the statutory language defines intimidation as "*subjecting* a person *** to participation in or the witnessing of: physical force against another***." (Emphasis added.) 750 ILCS 60/103(10) (West 2024). The word "subject" is defined by Black's Law Dictionary as "[t]o cause to undergo some action, agent, or operation." *Subject*, Black's Law Dictionary (10th ed. 2014). It follows that "intimidation of a dependent" under the Act is defined as causing someone to witness physical force against another. The plain language of the statute does not require anything beyond that.

¶ 32　Jamie essentially asks us to look beyond the plain text of the statute to interpret the word "subjecting." We decline to do so, as we can determine the legislative intent from the plain text of

the statute. See *People v. Roberts*, 214 Ill. 2d 106, 116 ("If we can determine the legislative intent from the plain language of the statute, we will give that intent effect without resorting to other interpretive aids."). However, even if we were to entertain Jamie's contentions, we do not find them compelling.

¶ 33    Each of Jamie's contentions allege that the legislature's choice to include the word "subjecting" in the statutory definition of "intimidation" under the Act requires some level of intent—something more than a mere witnessing of abuse.

¶ 34    First, she contends that in viewing the statute as a whole, abuse is repeatedly defined as specific and affirmative conduct perpetrated by a person against another. She points to the statutory definitions of harassment, interference with personal liberty, and willful deprivation in support of this. See 750 ILCS 60/103(7), (9), (15) (West 2024). She then goes on to contend that the purpose of the Act is to identify such conduct as violence and to hold perpetrators of such acts accountable for the criminal nature of their conduct. In other words, the Act is focused on the criminal nature of abuse, with emphasis on holding abusers culpable for conduct that is knowing and willful. Her point seems to be that in order to be abuse, the "intimidation" must be knowing or willful because (a) other definitions of abuse in the Act are specific and affirmative conduct and (b) the purpose of the Act is to hold abusers accountable for their knowing and willful conduct. Jamie does not cite to any authority to support this, aside from her citations to the Act.

¶ 35    Even so, Jamie's citations to the Act are misleading. Section 102 of the Act outlines its purpose:

> "(1) Recognize domestic violence as a serious crime against the individual and society which produces family disharmony in thousands of Illinois families, promotes a pattern of escalating violence which frequently culminates in intra-

family homicide, and creates an emotional atmosphere that is not conducive to healthy childhood development.

(2) Recognize domestic violence against high risk adults with disabilities, who are particularly vulnerable due to impairments in ability to seek or obtain protection, as a serious problem which takes on many forms, including physical abuse, sexual abuse, neglect, and exploitation, and facilitate accessibility of remedies under the Act in order to provide immediate and effective assistance and protection.

(3) Recognize that the legal system has ineffectively dealt with family violence in the past, allowing abusers to escape effective prosecution or financial liability, and has not adequately acknowledged the criminal nature of domestic violence; that, although many laws have changed, in practice there is still widespread failure to appropriately protect and assist victims;

(4) Support the efforts of victims of domestic violence to avoid further abuse by promptly entering and diligently enforcing court orders which prohibit abuse and, when necessary, reduce the abuser's access to the victim and address any related issues of child custody and economic support, so that victims are not trapped in abusive situations by fear of retaliation, loss of a child, financial dependence, or loss of accessible housing or services;

(5) Clarify the responsibilities and support the efforts of law enforcement officers to provide immediate, effective assistance and protection for victims of domestic violence, recognizing that law enforcement officers often become the

secondary victims of domestic violence, as evidenced by the high rates of police injuries and deaths that occur in response to domestic violence calls; and

(6) Expand the civil and criminal remedies for victims of domestic violence; including, when necessary, the remedies which effect physical separation of the parties to prevent further abuse." 750 ILCS 60/102 (West 2024).

While holding abusers culpable is certainly a part of the Act's purpose, it is only a small portion of the overall act. Courts have held time and time again that the primary purpose of the Act is to aid victims of domestic violence and prevent further violence. *In re Marriage of Potenza and Wereko*, 2020 IL App (1st) 192454, ¶ 56; *Alison C. v. Westcott*, 343 Ill. App. 3d 648, 652; *Glater v. Fabianich*, 252 Ill. App. 3d 372, 376. Jamie repeatedly minimizes the situation, referring to it as a "mere witnessing" as opposed to true intimidation. However, research has shown that merely witnessing abuse causes significant harm to minors. See https://womenshealth.gov/relationships-and-safety/domestic-violence/effects-domestic-violence-children. Minors who witness abuse can be at greater risk of being violent in their future relationship. *Id.* They are also at greater risk of suffering mental health conditions such as depression and anxiety, and even physical health conditions including diabetes, obesity, and heart disease. *Id.* Given these significant harms, it was reasonable for the legislature to craft the statutory definition of "intimidation" as they did.

¶ 36    Further, the Act does not explicitly limit itself to acts of domestic violence that are knowing and willful. The fact that certain definitions of abuse within the Act contain an intent requirement does not automatically impute an intent requirement into the statutory definition of "intimidation." Had the legislature intended to include an intent requirement, it would have done so. As the legislature did not explicitly include an intent requirement into the definition, we will not read one into it. See *Roberts*, 214 Ill. 2d at 116 ("We will not depart from the plain statutory language by

reading into it exceptions, limitations, or conditions that are in conflict with the express legislative intent.").

¶ 37 Finally, Jamie compares the Act to the Criminal Code and contends that a finding of abuse requires both a voluntary act and some level of intent. She does not articulate what exact level of intent should apply, just that "intimidation" under the Criminal Code is a specific intent crime, therefore, intimidation under the Act must require some level of intent. However, as Benjamin points out, the Criminal Code does not apply here. Rather, the Illinois Domestic Violence Act of 1986 applies. Had the legislature intended for the definitions of "intimidation" to be the same in both the Illinois Domestic Violence Act of 1986 and the Criminal Code of 2012, it would have done so. Instead, the legislature provided a specific definition of "intimidation" in the context of obtaining an order of protection. That definition does not require any specific intent. To read into the statute an intent requirement would be improper. See *Roberts*, 214 Ill. 2d at 116 ("We will not depart from the plain statutory language by reading into it exceptions, limitations, or conditions that are in conflict with the express legislative intent.").

¶ 38 Here, both Benjamin and C.G. testified that Jamie pushed Benjamin and C.G. witnessed the pushing. Jamie exercised her 5th Amendment right regarding this incident, which the trial court was permitted to draw a negative inference from. See *People v. Houar*, 365 Ill. App. 3d 682, 690. Jamie's action of pushing Benjamin while C.G. was present caused C.G. to witness physical force against another. This fits squarely within the statutory definition of "intimidation," which qualifies as abuse under the Act. Accordingly, the trial court's finding of abuse was proper.

¶ 39 Turning now to Benjamin's argument on cross-appeal—that the trial court erred in granting Jamie "unrestricted parenting time" as a remedy under 750 ILCS 60/214(b)(7). We review a trial court's granting of remedies in an order of protection under an abuse-of-discretion standard. *Frank*

*v. Hawkins*, 383 Ill. App. 3d 799, 816. A trial court abuses its discretion only where its ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the trial court. *Blum v. Koster*, 235 Ill. 2d 21, 36. To the extent that Benjamin's argument requires us to engage in statutory interpretation, our review is *de novo*. *Dew-Becker v. Wu*, 2020 IL 124472, ¶ 12.

¶ 40    Section 214(b)(7) of the Act addresses parenting time as a remedy in the context of orders of protection:

> "The court shall restrict or deny respondent's parenting time with a minor child if the court finds that respondent has done or is likely to do any of the following: (i) abuse or endanger the minor child during parenting time; *** or (iv) otherwise act in a manner that is not in the best interests of the minor child." 750 ILCS 60/214(b)(7) (West 2024).

¶ 41    Benjamin argues that because the trial court made a finding of abuse, it was required to either restrict or deny Jamie's parenting time. While we do agree with him on this point, the trial court *did* comply with section 214(b)(7) of the Act, despite checking a box in the form plenary order of protection granting Jamie parenting time without restrictions. Jamie's parenting time *was* restricted in that she was only allowed to contact C.G. to coordinate pick-up and drop-off. No other phone calls, text, or videoconferences were permitted. Given that the trial court did comply with section 214(b)(7) of the Act by restricting Jamie's parenting time, we cannot find that the trial court abused its discretion. We will, however, exercise our powers of amendment pursuant to Illinois Supreme Court Rule 366(a)(1) to strike the term "without restrictions" from the form plenary order of protection. See Ill. Sup. Ct. R. 366(a)(1) (eff. Feb. 1, 1994).

¶ 42                                III. CONCLUSION

¶ 43    For the reasons stated, we affirm the judgment of the circuit court of McHenry County.

¶ 44    Affirmed.