# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 12
Jennifer White, et al.,
    Respondents,
     v.
Andrew Cuomo, &c., et al.,
    Appellants.

Victor Paladino, for appellants.
Jeffrey Sherrin, for respondents.
FanDuel, Inc. et al.; New Sports Economy Institute, amici curiae.

DiFIORE, Chief Judge:

Article I, § 9 of the New York Constitution authorizes "gambling" in certain circumstances and prohibits it in others. In 2016, after careful consideration, the New York State Legislature enacted article 14 of the Racing, Pari-Mutuel Wagering and Breeding

- 1 -

Law authorizing and regulating interactive fantasy sport (IFS) contests upon determining that IFS contests are not prohibited gambling activities because contestants use significant skill to select their rosters, creating fantasy teams, and therefore have influence over the outcome of the fantasy contests between IFS participants. Today, we clarify that the historic prohibition on "gambling" in article I, § 9 does not encompass skill-based competitions in which participants who exercise substantial influence over the outcome of the contest are awarded predetermined fixed prizes by a neutral operator. Because ample support exists for the legislature's determination that the IFS contests authorized in article 14 are properly characterized as lawful skill-based competitions for prizes under our precedent, plaintiffs have not met their burden to demonstrate beyond a reasonable doubt that article 14 is unconstitutional.

## I. *Article 14 of the Racing, Pari-Mutuel Wagering and Breeding Law*

IFS contests have been a popular form of entertainment for over 40 years and the pastime is played by millions of New Yorkers. Participants of IFS contests create virtual "teams," drawing from their knowledge of the sport and athlete performance to draft rosters comprised of simulated players based on professional athletes. These virtual teams—composed of athletes who play for different real-life teams—compete against virtual teams compiled by other IFS contestants. The performance of simulated players on an IFS roster corresponds to the performance of the real-life athletes—that is, participants of IFS contests earn fantasy points based on how their selected athletes perform specific acts in actual sporting events that occur after the IFS contest has closed. However, the outcome of an IFS contest does not mirror the success or failure of any real-life athlete or sports team.

This is because IFS rosters do not replicate real-life teams, IFS scoring systems are premised on an aggregation of statistics concerning each individual athlete's performance on specific tasks, and IFS contests pit the rosters of participants against one another rather than tying success to the outcome of sporting events. IFS contestants pay entry fees to participate, and the pre-set prizes paid to the most successful participants—along with operator revenues—are typically drawn from those entry fees.

Traditionally, IFS contests spanned the duration of a sporting season and, throughout the season, participants could "manage" their team by trading players, picking up free agents, and adjusting their lineups. In more recent years, operators began also offering weekly and daily IFS contests generally structured in the same manner, with IFS contestants assembling virtual teams of players drawn from multiple real-life teams within the confines of an assigned salary cap. Success in weekly or daily IFS contests, as with season-long competitions, does not depend on the performance of a single athlete or team. Notably, many professional sport leagues support fantasy sports, viewing the virtual games as a way to engage fans and partnering with IFS operators to promote the competitions.

In 2015, the Attorney General commenced actions against two IFS operators, seeking to enjoin daily IFS contests as "unlawful gambling" in violation of the Penal Law and State Constitution. This litigation—which was eventually discontinued with regard to the allegations of illegal gambling—prompted the New York State Legislature to review the legality of IFS contests. At a public hearing, legislators considered testimony from stakeholder representatives including, among others, the Fantasy Sports Trade Association, fantasy sports operators, horse-racing associations, and organizations opposed to the

proliferation of gambling. Following "extensive research into the operations of fantasy sports," the Racing and Wagering Committee concluded that "fantasy sports is not gambling and does not, therefore, violate . . . the New York State Constitution" (NY Assembly Debate on Assembly Bill A10736 [June 17, 2016] at 145).

After robust debate, the legislature enacted article 14 of the Racing, Pari-Mutuel Wagering and Breeding Law (*see* L 2016, ch 237), authorizing registered prize-based IFS contests conducted in accordance with various restrictions and subject to regulatory oversight (*see* Racing, Pari-Mutuel Wagering and Breeding Law §§ 1402, 1405 1411, 1412). The legislature declared that IFS contests are not "gambling" within the meaning of the Penal Law (*see* Penal Law § 225.00 [1], [2])[1] because the outcomes of such contests are dependent upon "the skill and knowledge of the participants," rather than chance, and the "contests are not wagers on future contingent events not under the contestants' control or influence" because the outcome is dependent upon the comparative skill of each IFS participant as measured against one another (Racing, Pari-Mutuel Wagering and Breeding Law § 1400 [1] [a], [b]; [2]; *see* § 1401 [8]).

## II. Procedural History

Soon after the legislature enacted article 14 of the Racing, Pari-Mutuel Wagering and Breeding Law, plaintiffs commenced this action against defendants, then-governor Andrew Cuomo and the New York State Gaming Commission, seeking a permanent

---

[1] The Penal Law subjects certain gambling related conduct to criminal penalty, such as promoting gambling other than as a player, possession of gambling records, and gaming fraud (*see generally* Penal Law art 225).

injunction precluding implementation of article 14 and a declaration of constitutional invalidity. After defendants answered, denying plaintiffs' allegation that the IFS contests authorized by article 14 constitute prohibited gambling, the parties eventually stipulated to certain facts regarding IFS contests and cross-moved for summary judgment.

Supreme Court granted plaintiffs' motion for summary judgment in part, declaring that article 14 violates the constitutional prohibition on "gambling" to the extent it authorizes IFS contests, and also granted defendants' cross motion for summary judgment in part—thereby declaring article 14 valid to the extent it excludes IFS from the scope of the criminal statutes relating to gambling (62 Misc 3d 877 [Sup Ct, Albany County 2018]). Applying the Penal Law definitions of "gambling" and "contest[s] of chance" (Penal Law § 225.00 [1], [2]), the court reasoned that IFS contests are "gambling" under the State Constitution because they "involve[], to a material degree, an element of chance" inasmuch as the performance of real-life athletes is not subject to the IFS contestants' control (62 Misc 3d at 887). However, the court determined that the legislature acted within constitutional bounds to exclude IFS contests from the scope of the Penal Law provisions regarding gambling because, while the legislature lacked authority to authorize "gambling" prohibited by the Constitution, it "has the full authority to define and limit such offenses in the context of [a criminal] anti-gambling statute" (id. at 897-898).

Upon the parties' cross appeals, the Appellate Division modified and, as so modified, affirmed (181 AD3d 76 [3d Dept 2020]). Also applying the Penal Law definition of "gambling," the Appellate Division agreed with Supreme Court that IFS contests are "gambling" prohibited by the Constitution on the rationale that IFS participants do not

control the performance of the athletes on their rosters and, thus, the contests involve "a material degree of chance" (*id.* at 82-84). The Appellate Division further invalidated that portion of article 14 that excludes IFS from the scope of the criminal "gambling" provisions, asserting that—although constitutional—the legislature "would not have wished to preserve the decriminalization of IFS" in light of the court's invalidation of the majority of article 14 (*id.* at 86). However, the Appellate Division upheld the provision prohibiting unregistered IFS contests (*see* Racing, Pari-Mutuel Wagering and Breeding Law § 1412) since no IFS contests could lawfully be registered following its decision (*see* 181 AD3d at 84). A single Justice dissented, concluding that the record supported the legislature's determination that IFS outcomes do not depend to a material degree on chance or future contingent events not under the contestants' control and, as such, "the lawmakers properly determined that an IFS contest is not a constitutionally prohibited gambling activity" (*id.* at 87).

Defendants appealed to this Court as a matter of right on constitutional grounds (*see* CPLR 5601 [b] [1]), and we now reverse.

*III. Standard of Review*

The question before us is whether the legislature violated article I, § 9 of the New York Constitution when it enacted article 14 of the Racing, Pari-Mutuel Wagering and Breeding Law, authorizing certain IFS contests in New York. It is well settled that "[l]egislative enactments are entitled to 'a strong presumption of constitutionality'" (*Dalton v Pataki*, 5 NY3d 243, 255 [2005], quoting *Schulz v State of New York*, 84 NY2d 231, 241 [1994]), and "courts strike them down only as a last unavoidable result" (*Matter*

*of Van Berkel v Power*, 16 NY2d 37, 40 [1965]) after "every reasonable mode of reconciliation of the statute with the Constitution has been resorted to, and reconciliation has been found impossible" (*Matter of Fa*y, 291 NY 198, 207 [1943]). Thus, while the presumption of constitutionality is not irrefutable, as the party challenging a duly enacted statute, plaintiffs "face the initial burden of demonstrating [article 14's] invalidity 'beyond a reasonable doubt'" (*LaValle v Hayden*, 98 NY2d 155, 161 [2002], quoting *People v Tichenor*, 89 NY2d 769, 773 [1997]; *see Matter of Moran Towing Corp. v Urbach,* 99 NY2d 443, 448 [2003]; *Matter of Saratoga Water Servs. v Saratoga County Water Auth.*, 83 NY2d 205, 211 [1994]; *Wiggins v Town of Somers*, 4 NY2d 215, 218-219 [1958]). Moreover, as the party mounting a facial challenge to article 14, plaintiffs "'bear[] the substantial burden of demonstrating that in any degree and in every conceivable application, the law suffers wholesale constitutional impairment'" (*Matter of E.S. v P.D.*, 8 NY3d 150, 158 [2007], quoting *Matter of Moran Towing Corp.*, 99 NY2d at 448).

To be sure, it does not follow from the presumption of constitutionality that IFS contests are "excluded from the constitutional meaning of 'gambling' merely because the [l]egislature now says that it is so" (181 AD3d at 81). The Constitution does not delegate the legislature unfettered authority to determine whether particular activities constitute "gambling" (*see* NY Const, art I, § 9; 4 Rev Rec, 1894 NY Constitutional Convention at 1080-1086, 1122; *People ex rel. Sturgis v Fallon*, 152 NY 1, 11-12 [1897]). Indeed, it is "the province of the [j]udicial branch" to define the rights and prohibitions set forth in the State Constitution (*Campaign for Fiscal Equity v State of New York*, 100 NY2d 893, 925

[2003]), "which constrain the activities of all three branches" of the government *(Board of Educ., Levittown Union Free School Dist. v Nyquist*, 57 NY2d 27, 39 [1982]).

Nevertheless, when a legislative enactment is challenged on constitutional grounds, there is both an "exceedingly strong presumption of constitutionality" and a "presumption that the [l]egislature has investigated for and found facts necessary to support the legislation" (*I.L.F.Y. Co. v Temporary State Hous. Rent Commn.*, 10 NY2d 263, 269 [1961]; *see Lincoln Bldg. Assoc. v Barr*, 1 NY2d 413, 415 [1956]).  While courts may look to the record relied on by the legislature, even in the absence of such a record, "factual support for the legislation would be assumed by the courts to exist" (*I.L.F.Y. Co.*, 10 NY2d at 270).  Ultimately, because "[e]very intendment is in favor of the validity of statutes" (*People ex rel. Sturgis*, 152 NY at 11 [quotation marks and citation omitted]), "[w]here the question of what the facts establish is a fairly-debatable one, we accept and carry into effect the opinion of the legislature," (*Lincoln Bldg. Assoc.*, 1 NY2d at 415 [internal quotation marks and citation omitted]), which is the arbiter of questions of "wisdom, need or appropriateness" (*Defiance Milk Prods. Co. v Du Mond*, 309 NY 537, 541 [1956] [internal quotations marks and citation omitted]).  Thus, while the legislature may not circumvent the Constitution merely by declaring that an activity which unquestionably constitutes prohibited "gambling" should no longer be considered such, we must remain cognizant of the "distribution of powers in our State government" that render it improper for courts to lightly disregard the considered judgment of a legislative body that is also charged with a duty to uphold the Constitution (*New York Pub. Interest Research Group v Steingut*, 40 NY2d 250, 257 [1976]).

*IV. The Constitutional Meaning of "Gambling"*

Central to this dispute, article I, § 9 of the New York Constitution provides that—except as authorized therein—"no lottery or the sale of lottery tickets, pool-selling, book-making, or any other kind of gambling . . . shall . . . be authorized or allowed within this state" (NY Const, art I, § 9 [1]), a provision largely dating back to 1894. The term "gambling" is undefined, and the extent to which it has been permitted by the Constitution has evolved over time.

The first State Constitution did not regulate lotteries or other forms of gambling (1777 NY Const). Private lotteries were generally prohibited by statute, but public lotteries raising monies for various purposes were lawful (*see* 3 Charles Z. Lincoln, The Constitutional History of New York at 34-38 [1906]). In 1821, the Second New York Constitution prohibited "lotteries" and the sale of "lottery tickets" not already authorized by law (1821 NY Const, art VII, § 11) and the legislature enacted various statutes to implement this constitutional prohibition (*see* 3 Lincoln, The Constitutional History of New York at 46). For more than 70 years, the constitutional prohibition remained limited to lotteries.

While the Constitution did not address other forms of gambling, as a matter of statutory law, bets and wagers upon matters of chance, races, and other future contingent events were unlawful in New York and contracts for such bets and wagers were void (*see* 2 Rev Stat of NY, part I, ch XX, tit VIII, § 26, at 918 [6th ed 1875]; Rev Stat of NY, pt I, ch XX, tit VIII, § 8, at 662 [1st ed 1829]). As of 1877, the legislature had gone further and criminalized the facilitation of "bets or wagers, or . . . selling pools" on, as relevant here,

"contest[s] of skill, speed or power of endurance, of man or beast" (L 1877, ch 178; *see* 3

Lincoln, The Constitutional History of New York at 46; 4 Rev Rec, 1894 NY

Constitutional Convention at 1083; Penal Code of 1881 §§ 351, 352). Approximately ten

years later, however, the legislature enacted the "Ives Pool Law," suspending the

criminalization of betting and wagering on horse races at racetracks during particular

months of the year (*see* L 1887, ch 479; L 1893, ch 469). The Ives Pool Law prompted

delegates to the Constitutional Convention of 1894—critical of the legislature's decision

to carve out particular seasons and locations for betting on horse races—to address

"gambling" beyond "lotteries" in the next revision of the New York Constitution (*see* 4

Rev Rec, 1894 NY Constitutional Convention at 1082-1086). Thus, the Fourth

Constitution, adopted in 1894, provided that no "lottery or the sale of lottery tickets, pool

selling, bookmaking, or any other kind of gambling [shall] hereafter be authorized or

allowed within this State; and the Legislature shall pass appropriate laws to prevent

offenses against any of the provisions of this section" (4 Rev Rec, 1894 NY Constitutional

Convention at 1131).[2]

---

[2] Regardless of what the New York Times opined (*see* dissenting op at 9), there was no consensus as to whether the Ives Pool Law violated the then-existing constitutional prohibition on lotteries when it was enacted. The Fourth Department rejected a constitutional challenge, asserting that "it was not the intent of the framers of the constitution either of 1846 or 1821, in the use of the word 'lottery,' to include in it the subject of betting" because games of chance—such as lotteries—and betting were "distinct subjects upon the statute book and in the public mind" (*Reilly v Gray*, 28 NYS 811, 815 [Sup Ct, Gen Term, 4th Dept 1894]). Moreover, the delegates of the 1894 Constitutional Convention did not criticize the Ives Pool Law as unconstitutionally authorizing "lotteries"—which were acknowledged by delegates to be a particular "form" of gambling distinct from that permitted by the Ives Pool Law (*see* 4 Rev Rec, 1894 NY Constitutional

New York's constitutional prohibition on lotteries and gambling in 1894 was consistent with the times as, "[b]y the end of the 19th century, gambling was largely banned throughout the country" (*Murphy v National Collegiate Athletic Assn.*, 584 US —, —, 138 S Ct 1461, 1468-1469 [2018]).  However, total bans on gambling were short-lived.  By the 1920s and 1930s, "laws prohibiting gambling were gradually loosened" around the country (*id.* at —, 138 S Ct at 1469).  In line with this national trend, from the late 1930s through today, article I, § 9 has been repeatedly amended to legalize various forms of lotteries and gambling.  Revisions include a 1939 amendment allowing pari-mutuel betting on horse races; 1957 and 1975 amendments authorizing localities to permit certain religious, charitable and nonprofit organizations to conduct "games of chance," including "bingo or lotto"; a 1966 amendment empowering the legislature to create a state lottery system to aid in the funding of education; and—most recently—a 2013 amendment expressly authorizing casino gaming at up to seven locations throughout the state.  More than 50 years ago, even before the most recent significant expansion of legal gaming, we recognized that "the New York public does not consider authorized gambling a violation of some prevalent conception of good morals [or], some deep-rooted tradition of the common weal" (*Intercontinental Hotels Corp. [Puerto Rico] v Golden*, 15 NY2d 9, 15 [1964] [internal quotation marks and citation omitted]).

While the New York Constitution now allows various forms of regulated gaming, article I, § 9 continues to prohibit "pool-selling, book-making, or any other kind of

_____

Convention at 1080).  Rather, the delegates criticized the Ives Pool Law as inconsistent with the *legislature's* decision to otherwise prohibit such betting (*see id.* at 1082-1086).

gambling" not authorized therein.  It is our task to determine whether the legislature erred in finding that article 14 IFS contests fall outside the scope of this prohibition.  To do that, we must discern the meaning of the term "gambling"—a term the Constitution does not define and never has defined—keeping in mind that, in construing the language of the Constitution, the courts look to the intent at the time of adoption and "'give to the language used its ordinary meaning'" (*Burton v New York State Dept. of Taxation & Fin.*, 25 NY3d 732, 739 [2015], quoting *Matter of Carey v Morton*, 297 NY 361, 366 [1948]).

Plaintiffs urge us to apply the definition of "gambling" set forth in the Penal Law, asserting that it reflects the ordinary meaning of that term.  Today, the Penal Law defines "gambling" as the staking or risking of something of value upon the outcome of either "a contest of chance" or upon "a future contingent event not under [one's] control or influence" (Penal Law § 225.00 [2]).  While a helpful guidepost, this definition does not necessarily reflect the ordinary meaning of the term "gambling" in 1894 inasmuch as this statute was not adopted until 1965, over 70 years after "gambling" was added to article I, § 9 (*see Dalton*, 5 NY3d at 264).  Rather, we must look to the plain language, history, and purpose of the constitutional provision, as well as relevant precedent, contemporaneous statutes, and dictionary definitions to understand what constitutes "gambling" prohibited by the Constitution (*see Bransten v State of New York*, 30 NY3d 434, 439-440 [2017]; *De La Cruz v Caddell Dry Dock & Repair Co., Inc.*, 21 NY3d 530, 534 [2013]).

Drawing from these sources, the parties before us agree that the 1894 Constitution expanded the scope of the constitutional prohibition from just "lotteries" to include any kind of "gambling," and that such prohibition encompasses the risking of money or

something of value on "games of chance," as well as "bets and wagers" by nonparticipants on competitions of skill. That the risking of value on "games of chance" falls within the scope of "gambling" under article I, § 9 is evidenced by the express prohibition on "lotteries"—a particular type of game of chance (*see Dalton*, 5 NY3d at 264; *People v Miller*, 271 NY 44, 46-47 [1936]). The record of the 1894 Constitutional Convention (*see* 4 Rev Rec, 1984 Constitutional Convention at 1081, 1119), the former Penal Code (*see* Penal Code at 1893 §§ 323, 336, 340; *People v Todd*, 4 NYS 25, 26 [Sup Ct, Gen Term, 1st Dept 1889]), and dictionary definitions from the relevant time period (*see e.g.* Gamble, Oxford English Dictionary, Vol IV, Pt II, "G" [1901]), likewise demonstrate that "games of chance" were considered "gambling" in 1894. Subsequent constitutional amendments authorizing "games of chance" under certain circumstances confirm that such games are within the ambit of article I, § 9.

Similarly, the text of article I, § 9 prohibiting book-making and pool-selling—terms relating to betting schemes[3]—and the inclusion of language prohibiting "any other kind of gambling" indicates that the Constitution also prohibits betting and wagering on contests of skill. This is underscored by the record of the 1894 Constitutional Convention, which reflects an intent to counteract the legislature's then-recent enactment of the Ives Pool Law

---

[3] Pool selling is "a scheme for facilitating betting on horse races" where a bettor deposits money with a manager, selects a horse and, depending on the type of pool, "[t]he event of the race determines the winner," with the bettor getting the whole, less the manager's commissions (*Reilly*, 28 NYS at 815; *see United States ex rel. Rafanello v Hegstrom*, 336 F2d 364, 366 [2d Cir 1964]). Book-making is generally understood to be a process in which a bookmaker prepares a schedule of odds and solicits bets, with winners taking a share of the betting pool and the bookmaker taking a percentage of profit (*see People ex rel. Lichtenstein v Langan*, 196 NY 260, 264-265 [1909]).

authorizing betting and wagering on horse races under certain circumstances (*see* 4 Rev Rec, 1894 NY Constitutional Convention at 1082-1086), and further supported by the statutes then in effect addressing betting and wagering as gambling (*see e.g.* 2 Rev Stat of NY, part I, ch XX, tit VIII, § 26, at 918 [6th ed 1875]; Penal Code of 1881 §§ 351, 352).[4]

But, while the parties agree that the prohibition on "gambling" should be understood to prohibit games of chance and bets and wagers on contests of skill unless otherwise authorized by article I, § 9, they dispute the contours of those categories and the proper classification of IFS contests. Plaintiffs contend that IFS contests constitute either "games of chance" or "bets or wagers" because participants stake money on a game (by paying an entrance fee) in which points are awarded based on the performance of athletes the IFS participants do not control. In response, defendants assert that, although IFS contests may arguably superficially resemble "gambling," the legislature reasonably concluded they are neither "games of chance" nor "bets or wagers" on competitions of skill because IFS contests are themselves skill-based contests in which fixed prizes are awarded based upon the participants' own exercise of their relevant knowledge, judgment, and strategy.

---

[4] Indeed, it is only the dissent that rejects the ordinary meaning of "gambling" as encompassing games of chance and bets and wagers but excluding games of skill. While the dissent devotes several pages to reciting statements made by delegates of the 1894 Constitutional Convention, these statements establish only the uncontroversial intent to prohibit, absent constitutional amendment, all forms of gambling—a term the delegates did not define (*see* dissenting op at 9-13). Notably, however, several delegates commented that all types of gambling were already prohibited by statute with the exception of book-making and pool-selling under the Ives Pool Law (*see* 4 Rev Rec, 1894 NY Constitutional Convention at 1112, 1117, 1118, 1122, 1126, 1130), demonstrating an intent that the constitutional prohibition on "gambling" apply to games of chance and bets and wagers as already prohibited by statute.

Defendants further contend that the legislature's conclusion that IFS contests are not "gambling" is consistent with long-standing precedent delineating the nuanced parameters of that term.  We agree.

### A.  Games of Chance

Today, the Penal Law defines "contest[s] of chance" as those "in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein" (Penal Law § 225.00 [1]).  The courts below applied this metric to conclude that IFS contests are contests of chance and, therefore, a form of "gambling" prohibited by article I, § 9 of the Constitution.  This was error.

When the 1894 Constitution was adopted, "games of chance" were commonly understood to be those in which the element of chance was "the *dominating* element that determines the result of the game" (*People ex rel. Ellison v Lavin*, 179 NY 164, 170-171 [1904] [emphasis added]).  In *People ex rel. Ellison v Lavin*, this Court was called upon to determine whether a particular scheme constituted a "lottery" for purposes of the former Penal Code provisions (*see id.* at 168).  In that case, in determining whether a scheme in which customers guessed the number of cigars taxed by the government in a particular month constituted a "lottery," the Court scrutinized the difference between "games of chance" and "games of skill" (*see id.* at 170) and, thus, provided guidance more broadly as to the ordinary meaning of "gambling" around the relevant time period.  Recognizing that all games inevitably involve some degree of chance, the Court in *Ellison* explained that "[t]he test of the character of the game is not whether it contains an element of chance or an element of skill, but which is the *dominating* element that determines the result of the

game" (*id.* at 170-171 [emphasis added]).   Applying this dominating element test, we

concluded it was "perfectly clear that the *dominating* and *controlling* factor in the award

of the prizes [was] chance" (*id.* at 172-173 [emphases added]) because the contest was

structured in such a manner as to "eliminate as far as practicable the elements of knowledge

and judgment . . . [and] make the contest as fair a gamble . . .  as possible" (*id.* at 174).

New York courts have historically applied the dominating element standard to

determine whether a particular activity constituted a "game of chance"—reflecting a shared

understanding that "gambling" encompasses those games dominated by chance, not skill

(*see e.g. People ex rel. Lawrence v Fallon*, 152 NY 12, 17 [1897]; *Matter of Shapiro v

Moss*, 245 App Div 835, 835 [2d Dept 1935], *affd* 270 NY 609 [1936]; *People v Stiffel*, 61

Misc 2d 1100, 1100 [App Term, 2d Dept 1969]; *People v Li Ai Hua*, 24 Misc 3d 1142,

1145 [Crim Ct, Queens County 2009]; *Valentin v El Diario La Prensa*, 103 Misc 2d 875,

878 [Civ Ct, Bronx County 1980]; *People v Cohen*, 160 Misc 10, 11 [Magistrate's Ct,

Queens County 1936]).[5]   By comparison, the "material degree" standard advanced by

plaintiffs surfaced in 1965 when the legislature consolidated the Penal Law provisions

governing lotteries and gambling and statutorily defined various terms, including "contest

of chance" (L 1965, ch 1030).   To the extent there is any difference between the "material

degree" or "dominating" element standard in this context, the proper benchmark for

---

[5] The dominant element test has also been adopted by the courts of other states (*see e.g. Dew-Becker v Wu*, 2020 IL 124472, ¶ 25, 178 NE3d 1034, 1040 [2020], *reh denied* [Sept. 28, 2020]; *In re Allen*, 59 Cal 2d 5, 6, 377 P2d 280, 281 [1962]; *Las Vegas Hacienda, Inc. v Gibson*, 77 Nev 25, 30, 359 P2d 85, 87 [1961], *reh denied* Mar, 2, 1961; *Lucky Calendar Co. v Cohen*, 20 NJ 451, 462, 120 A2d 107, 112-113 [1956]; *State v Ricciardi*, 18 NJ 441, 445, 114 A2d 257, 259 [1955]; *Boosalis v Crawford*, 99 F2d 374, 376 [DC Cir 1938]).

assessing whether an activity is a "game of chance" for purposes of the constitutional gambling prohibition is whether chance is the dominating or controlling element.[6]

Turning to the controversy here, the legislature's factual determination that IFS contests are a game of "skill," not of "chance" (Racing, Pari-Mutuel Wagering and Breeding Law § 1401 [8])—and therefore are not "gambling"—has resounding support. Evidence presented to the legislature indicated that outcomes in IFS contests are predominantly based on skill. Studies showed that skilled players achieve significantly more success in IFS contests and that rosters of skilled human players were more successful in IFS contests than randomly generated lineups over 80% of the time. Through a statistical analytic report quoted at the public legislative hearing, an expert opined that IFS games "have an inherent and vast character of skill where chance is overwhelmingly immaterial in the probability of winning" and winning a prize in such contests "strongly depends more on skill than on chance." In fact, it is now "widely recognized" that IFS contests are predominately skill-based competitions (*Dew-Becker v Wu*, 2020 IL 124472, ¶ 26, 178 NE3d at 1040-1041 [2020]).

Indeed, unlike in *Ellison* where skill played little to no role in the cigar-guessing contest, the facts here bear out that IFS competitions involve a significant exercise of the participants' skills. Participants draw from their knowledge of the relevant sport, player

---

[6] We need not consider what, if any, difference exists between games dependent upon chance to a material degree and those which are dominated by the element of chance because, here, we are concerned with the scope of "gambling" only for purposes of article I, § 9 of the Constitution and the legislature is free to extend statutory prohibitions on games of chance beyond those prohibited by the Constitution.

performance and histories, offensive and defensive strengths of players and teams, team schedules, coaching strategies, how certain players on opposing teams perform against each other, statistics, strategy, and the fantasy scoring system in order to exercise considerable judgment in selecting virtual players for their rosters. Although participants are not able to influence athlete performance in actual sporting events, their skill nevertheless plays a substantial role in the outcome of the IFS contest—that is, the competition between IFS participants as to whose roster will yield more fantasy points, a contest which is scored through a metric different from that of the actual sport.

We do not discount plaintiffs' contention that chance plays some role in IFS contests given their connection to real-life sporting events over which the contestants lack control. The points scored by participants correlate to the real-life performance of the athletes on the participant's fantasy roster, and IFS participants concededly cannot themselves influence the day-to-day performance of such athletes. Nevertheless, as the record demonstrates, the legislature's determination that IFS contests are *predominantly* games of skill because they pit the strategic rosters of participants against one another—that is participants have control over their own skill-based roster selection, which substantially determines the outcome of the IFS contest—is firmly grounded in evidence and logic. In fact, plaintiffs have offered no proof to the contrary, relying merely on the existence of the Attorney General's prior allegations against certain IFS operators and a New York Times crossword puzzle characterizing IFS as involving "bets" as their evidence that IFS contests constitute "gambling."

In reviewing the constitutionality of legislative action, if there "can be discovered any state of facts either known or which could reasonably be assumed to afford support for the legislative decision," courts may not "substitute their judgment for that of the [l]egislature," as the dissent does (*Lincoln Bldg. Assoc.* v Barr, 1 NY2d at 415 [internal quotation marks and citation omitted]).  Here, we need not assume facts as the legislature's determination of the skill issue—a fact question—is supported by considerable evidence, both from the record of the public legislative hearing and the materials produced by defendants in support of their motion for summary judgment, demonstrating that IFS contests are not games of chance because the outcome is predominantly dependent upon the skill of the participants. Article 14 requires that IFS contests maintain this skill-based character (*see* Racing, Pari-Mutuel Wagering and Breeding Law § 1404 [1] [n]-[q]).  Inasmuch as IFS contests authorized by article 14 are not "games of chance" within the meaning of the constitutional prohibition on "gambling," the courts below erred by invaliding article 14 on that ground.

## B.  Betting and Wagering

Nor have plaintiffs met their heavy burden of establishing beyond a reasonable doubt that the IFS contests authorized by article 14 constitute "bets or wagers" on future events outside of the contestants' influence or control.  Not every contest that involves monetary stakes constitutes gambling.  To the contrary, we have long distinguished the "bets and wagers" of gambling activities from lawful contests that award prizes to competitors—contests integral to the fabric of American social life, spanning the range from spelling bees to golf tournaments to televised game shows.

The contest at issue in *People ex rel. Lawrence v Fallon* is illustrative (152 NY at 19). There, after offering prizes in connection with horse races, the relator—an officer of a horse racing association—was charged with violating former Penal Code provisions prohibiting bets and wagers on contests of skill.  Horse owners (who were not necessarily horse "trainers") were permitted to enter their horses into races upon submission of an entrance fee and the owner of the winning horse was awarded a prize.  In concluding that this contest did not constitute unconstitutional "gambling," we drew a distinction between a permissible competition where a contestant pays an entry fee to a nonparticipant in order to compete for a prize that is fixed without regard to the sum of the entry fees, and gambling—"where the stake is contributed by the participants alone, and the successful contestant is to have the fund thus created"; the latter is a "mere bet or wager, while the former is for a prize offered by one not a party to the contest" (*id.* at 18-19; *see People ex rel. Weaver v Van De Carr*, 150 NY 439, 442 [1896]).[7]

Permissible contests for prizes, we explained, share the "essential particulars" that "one of the parties strives with others for a prize; the competing parties pay an entrance fee for the privilege of joining in the contest, and . . . the entrance fee forms a part of the general fund from which the premiums or prizes are paid" (*Lawrence*, 152 NY at 19).  By comparison, bets and wagers are "agreement[s] between two or more, that a sum of money

---

[7]  The dissent asserts that, "under the majority's definition, poker, blackjack and commonly understood forms of gambling are not gambling, because of the level of skill they entail" (dissenting op at 17-18).  Of course, no issue is presented here as to whether such card games—which, needless to say, are quite distinct from IFS contests—constitute "gambling."  In any event, the dissent ignores the fact that, where games incorporate bets or wagers, the level of skill involved would not be determinative.

or some valuable thing, in contributing which all agreeing take part, shall become the property of one or some of them, on the happening in the future of an event at the present uncertain" (*Harris v White*, 81 NY 532, 539 [1880]). In other words, "'[i]llegal gaming implies *gain and loss between the parties* by betting, such as would excite a spirit of cupidity'" (*id.* at 539, quoting *People v Sergeant*, 8 Cow 139, 141 [Sup Ct 1828])—an element that is notably lacking when entrance fees are fixed, and predetermined prizes are awarded by a neutral party whose monetary stake is limited to the payment of the prize.[8]

Contests charging entry fees and awarding fixed prizes do not constitute gambling prohibited by article I, § 9 of the Constitution. The IFS contests authorized by article 14 are structured in the manner of fixed prizes for skill-based competitions—consistent with the teachings of *Lawrence* (152 NY at 19). Article 14 permits only IFS contests that have prizes that are predetermined, announced prior to the start of the contest, awarded by a neutral operator, and which do not change based upon the number of participants or the amount of entry fees collected (*see* Racing, Pari-Mutuel Wagering and Breeding Law § 1404 [1] [n]-[q]). Thus, IFS participants are not "wagering" in the hopes of scoring a pool of funds "wagered" by other players; rather, at the outset, an IFS contestant knows the set fee to enter the competition and the sum total of prizes that may be awarded—and that sum must be awarded even if entry fees are insufficient to cover the cost of the prize. In this

---

[8] Courts of other states have drawn similar distinctions between "bets and wagers" and prizes for contests (*see Humphrey v Viacom, Inc.*, 2007 WL 1797648, at *8, 2007 US Dist LEXIS 44679, *20-21 [D NJ, June 20, 2007, No. 06-2768 (DMC)]; *State v American Holiday Assn., Inc.*, 151 Ariz 312, 314, 727 P2d 807, 809 [1986]; *Las Vegas Hacienda, Inc.*, 77 Nev at 28-29, 359 P2d at 87; *Toomey v Penwell*, 76 Mont 166, 245 P 943, 945 [1926]).

regard, the legislature was careful to authorize only a contest for a prize, not place its imprimatur on a scheme of prohibited bets and wagers.

Plaintiffs and the dissent maintain that, notwithstanding the structure, IFS contests are indistinguishable from sports betting because the points awarded to participants are tied to the performance of real-life athletes over which participants have no influence or control. To be sure, in this respect, IFS contests are distinct from spelling bees, golf tournaments, and essay competitions, which do not involve the performance of a third party. However, unlike bets or wagers on games of skill in which a bettor takes no part, participants in IFS contests engage in a distinct game of their own, separate from the real-life sporting events, in which they strive against other IFS participants.

The outcome of an IFS contest turns—not on the performance of real-life athletes, as it would with respect to a bet or wager—but on whether the participant has skillfully composed and managed a virtual roster so as to garner more fantasy points than rosters composed by other participants. An IFS contestant's success is therefore not dependent upon the outcome of any particular real-life athlete's performance or on the score sheet of any sporting event. Rather, success in IFS contests is relative, measured only by the quantity and quality of skill exercised by other IFS participants. The legislature mandated as much, requiring that IFS operators ensure that "all winning outcomes reflect the relative knowledge and skill of the authorized players" and that outcomes are never based on the score, point spread, or performance of a single athlete, team, or sporting event (Racing, Pari-Mutuel Wagering and Breeding Law § 1404 [1] [o]-[q]). Given the careful circumscription of article 14, plaintiffs' and the dissent's attempts to portray IFS contests

as unlawful "gambling" simply because they relate to professional sporting events are unavailing, and plaintiffs have failed to satisfy us beyond a reasonable doubt that IFS contests constitute bets or wagers on future contingent events.

*V. Conclusion*

As we now clarify, the prohibition on "gambling" in article I, § 9 encompasses either the staking of value on a game in which the element of chance predominates over the element of skill or the risking of value through bets or wagers on contests of skill where the pool of wagered value is awarded upon some future event outside the wagerer's influence or control. However, games in which skill predominates over chance and skill-based competitions for predetermined prizes in which the participants have influence over the outcome do not constitute "gambling."

Contrary to the dissent's contention, in clarifying the meaning of the term "gambling" in the State Constitution in this manner, we do no disservice to our judicial role or the separation of powers doctrine. Indeed, it is the dissent who abdicates the judicial role, providing no discernable definition for the term "gambling." In lieu of a coherent legal standard, the dissent obliquely relies on "common understanding[s]" (dissenting op at 17) and "societal judgment[s]" for its conclusion that IFS contests are unconstitutional gambling rather than permissible "desirable commercial speculation" (dissenting op at 19). Indeed, the dissent acknowledges that its approach provides no logical framework for assessing the constitutionality of any particular activity alleged to be "gambling" (*see* dissenting op at 18-19). Particularly in cases involving the constitutionality of a state statute—a law adopted by the duly-elected representatives of the people—the development

of fixed objective standards is imperative, as judges may not arbitrarily supplant the legislature's reasoned determinations with their own judgments or notions of commonsense under the guise of constitutional interpretation.

After careful consideration, the New York State Legislature reasonably concluded—as have many other state legislatures (*see e.g.* NJ Stat Ann 5:20-1; 29 Del Code Ann § 4861; Colo Rev Stat Ann § 44-30-1603 [4] [b]; Ind Code Ann 4-33-24-1; Iowa Code Ann § 99E.1; Tenn Code Ann § 47-18-1602; Ariz Rev Stat Ann § 5-1201; Mo Ann Stat § 313.905)—that IFS contests are neither games of chance, nor bets or wagers on sporting events but, rather are independent contests of skill over which the participants exert influence. It has been our repeated admonition, in light of our obligation to respect the powers of a coequal branch of government, that "legislation should not be declared unconstitutional unless it clearly appears to be so" and that "all doubts should be resolved in favor of the constitutionality of an act" (*Johnson v City of New York*, 274 NY 411, 430 [1937]; *see People v Nebbia*, 262 NY 259, 271 [1933], *affd* 291 US 502 [1934]). Here, in addition to being presumed constitutional, the legislature's determinations are supported by the legislative record, the summary judgment proof (which was not contradicted), and our precedent delineating the scope of the term "gambling." Therefore, plaintiffs have not met their heavy burden to establish that article 14 violates article I, § 9 of the New York Constitution.

Accordingly, the order of the Appellate Division insofar as appealed from should be reversed, with costs, and defendants' cross motion for summary judgment declaring that

article 14 of the Racing, Pari-Mutuel Wagering and Breeding Law does not violate article

I, § 9 of the New York Constitution granted.

WILSON, J. (dissenting):

Since 1894, New York's Constitution has prohibited "lotter[ies] . . . poolselling, bookmaking, or any other kind of gambling." Everyone knows that sports betting is gambling. Betting on how many touchdowns a particular player will score is gambling.

The defendants here agree. Aggregating several bets involving different players into a point total that is pitted against point totals of other bettors does not transform gambling into something else. The majority's explanation of why something everyone knows is gambling is not actually gambling brings to mind a brief exchange in *Casablanca*:

> Captain Renault: This café is closed until further notice. Clear the room at once!
>
> Rick: How can you close me up? On what grounds?
>
> Captain Renault: I'm shocked, shocked to find that gambling is going on in here!
>
> [A croupier hands Captain Renault a pile of money.]
>
> Croupier: Your winnings, sir.
>
> Captain Renault: Oh, thank you, very much.

Perhaps the majority is right that gambling does not today carry the same moral approbation it did in 1894; perhaps the plaintiffs are right that gambling addiction is a more severe problem now than then. Perhaps both are right. Those policy questions are immaterial here. Were there no constitutional prohibition on gambling, that policy dispute could be resolved through the legislative process. But because our Constitution prohibits any kind of gambling, the policy issues must be put to the voters of this state, in the form of a popular referendum to amend the Constitution (or via a constitutional convention). The Constitution was amended by popular vote to legalize horse racing; to allow charities to conduct raffles and other forms of gambling; to allow the state to run a lottery; and to allow the operation of up to seven casinos within the state. The great damage done by today's decision is not the legalization of gambling (which has existed, in an illegal but mildly tolerated form throughout the state's history), but the affront to the importance of

our Constitution and the role of the courts—in particular this Court—in upholding the Constitution and defending it from ordinary legislative incursion.

Although we presume the constitutionality of a statute and will construe it, if reasonably possible, to avoid unconstitutionality, we do not defer to legislative interpretations of constitutional provisions or the words within them. Instead, "in construing the Constitution we seek the meaning which the words would convey to an intelligent, careful voter," because "[i]t is the approval of the People of the State which gives force to a provision of the Constitution" (*Matter of Kuhn v Curran*, 294 NY 207, 217 [1945]; *Matter of Carey v Morton*, 297 NY 361, 366-367 [1948]). What constitutes "gambling" under the Constitution is not a question entitled to any legislative or administrative deference. If article 14 authorizes gambling that the Constitution clearly prohibits, then we must strike down that statute, as we have done when statutes authorize conduct foreclosed by the Constitution (*see, e.g. People v Viviani*, 36 NY3d 564 [2021]; *Protect the Adirondacks! Inc. v N.Y. State Dept. of Envtl. Conservation*, 37 NY3d 73 [2021]; *Matter of Kuhn*, 294 NY at 211-212, 220). Demurring that the legislative branch "has investigated for and found facts necessary to support the legislation," the majority diminishes this Court's authority and responsibility, leading it to conclude, I suppose, that Supreme Court and the Appellate Division "lightly disregard[ed] the considered judgment of a legislative body that is also charged with a duty to uphold the Constitution" (majority op at 8). Those courts better understood our role: constitutions exist as a check on legislative and executive activity.

**I**

Prior to the enactment of article 14, DraftKings, Inc. and FanDuel began offering online interactive fantasy sports ("IFS") contests in New York State. The parties herein stipulated that:

> "Participants in such contests select fantasy teams of real-world athletes and compete against other contestants based on a scoring system that awards points based on the individual athlete's performances in actual sporting events that are held after contests are closed and no more participants may enter the contest. Participants in fantasy sports contests may use, among other things, their sports knowledge and statistical expertise to determine how athletes individually, and their fantasy teams overall, are likely to perform in such sporting events. Participants cannot control how the athletes on their fantasy sports teams will perform in such sporting events."

The parties also stipulated that the winners were paid from the fees paid by all entrants to a given game, less fees taken by DraftKings or FanDuel. Various permutations of online IFS contests offered participants the chance to win large jackpots, some greater than $1 million, based on the points they amassed. The companies spent millions of dollars advertising in New York the large jackpots and the potential for life-changing payouts.

In 2015, the New York Attorney General sent cease and desist letters to DraftKings and FanDuel, stating that their "operations constitute illegal gambling under New York law." The Attorney General elaborated that FanDuel's and DraftKings' "customers are clearly placing bets on [events] outside of their control or influence, specifically on the real-game performance of professional athletes. Further, each . . . wager represents a wager on a 'contest of chance' where winning or losing depends on numerous elements of chance to a 'material degree.'" The Attorney General further admonished the companies that their operations were "creating the same public health and economic problems associated with

gambling, particularly for populations prone to gambling addiction and individuals who are unprepared to sustain losses, lured by the promise of easy money. . . . Ultimately, it is these types of harms that our Constitution and gambling laws were intended to prevent in New York."[1]

DraftKings and FanDuel did not comply with the Attorney General's cease-and-desist letters. Thus, the Attorney General sued, charging that their operations were "in flagrant disregard of New York's state constitution, penal laws and other statutes." While the litigation proceeded, the gaming industry spent millions of dollars lobbying the legislature to authorize IFS in New York. Those efforts succeeded. In 2016, the legislature passed a statute that added article 14 to the Racing, Pari-Mutuel Wagering and Breeding Law. Article 14 authorized IFS contests that met certain conditions, and the new law established mechanisms for regulating and taxing companies offering IFS contests.

Shortly thereafter, the Attorney General terminated its lawsuits against FanDuel and DraftKings. Then, Jennifer White, Katherine West, Charlotte Wellins and Anne Remington filed the instant lawsuit, essentially restating the Attorney General's claims against

---

[1] The Attorney General complained that DraftKings and FanDuel "run[ ] a casino-style gambling operation," "us[ing] advertisements to lure New York residents with promises of easy riches for a lucky few sports fans," noting that the CEO of one IFS company described IFS as "sports betting parlay on steroids." The Attorney General worried that "[t]he speed of DraftKings' games, the size of their jackpots, and the degree to which the games are sold as winnable have ensnared compulsive gamblers and threaten to trap populations at greater risk of gambling addiction, particularly male college students", prompting "gambling addiction experts and advocates to sound the alarm." The complaint directly compared IFS to "poker, blackjack, and horseracing," as forms of gambling where "a small percentage of professional gamblers manage to use research, software, and large bankrolls to extract a disproportionate share of [ ] jackpots."

DraftKings and FanDuel. The plaintiffs either have gambling disorders or have been harmed by others' gambling disorders; their standing to pursue this appeal is unquestioned. Both Supreme Court and the Appellate Division held that article 14 is unconstitutional. I agree with them.

**II**

Article I, § 9 of the Constitution provides: "no lottery or the sale of lottery tickets, pool-selling, book-making, or any other kind of gambling"—excepting certain lotteries authorized by the legislature, pari-mutuel betting on horse races prescribed by the legislature, and casino gambling at no more than seven facilities as prescribed by the legislature—"shall hereafter be authorized or allowed within this state." The Constitution further states that "the legislature shall pass appropriate laws to prevent offenses against any of the provisions of this section" (NY Const, art I, § 9 [1]). The Constitution then permits certain categories of games of chance, such as bingo or lotto, under certain restrictions (*id.* at § 9 [2]). The above exceptions to the blanket prohibition on gambling were each adopted by constitutional amendment, as was the blanket prohibition itself. The history of New York's prohibition of gambling and subsequent tailored amendments is illuminating: it evidences a powerful intention to constitutionalize the prohibition of all forms of gambling, to be overcome only by future constitutional amendments, not mere legislative action. It further demonstrates that "gambling" in the Constitution was defined by a commonsense understanding of the term, not by any measure of skill versus chance. The majority misreads that history.

A

Gambling was anathema to the public policy of New York long before New York became a state. As far back as the early 1700s, New York legislators criticized the rise of lotteries in the colony. In 1721, New York prohibited the disposition of goods "by way or in manner of lottery, raffling balloting, voluntary subscriptions, or other method that shall depend on or be determined by lot or chance" (3 Charles Z. Lincoln, Constitutional History of New York 34 [1906]). In 1772, New York decreed that all lotteries not specifically authorized by the legislature were "common and public nuisances" and set high penalties for violating the statute (*id.* at 35). Two years later, the legislature criminalized private lotteries (*id.*).

When delegates met in the Constitutional Convention of 1821, their concern expanded to include public lotteries alongside private ones (*id.* at 43). For one delegate, "lotteries constituted a 'legalized system of gambling;' [ ] all classes of society were affected by its pernicious influences, and [ ] like other gambling, 'its tendency was to destroy industry and economy;' [ ] benevolent societies considered it 'a fruitful source of pauperism,' and . . . 'it was the very worst mode which could be resorted to for the purpose of raising a revenue, as but a very small portion of the money extracted . . . ever found its way into the public treasury'" (*id.* at 43). Another delegate warned that "[t]he evil consequence of lotteries is more extensive than we can at first imagine" (L.H. Clarke, A Report of the Debates and Proceedings of the Convention of the State of New York, Held at the Capitol, in the City of Albany, on the 28th Day of August, 1821 at 299 [1821]). Not only did lotteries "demoralize the state" and "loosen[ ] the moral obligations of society",

they also "deprive[d] the family of the poor man of the pittance which his daily labour afforded them" (*id.*). That delegate rejected the idea of permitting lotteries for their revenue, stating that "a tax on vices of this kind operates as an encouragement to vice" (*id.* at 300). Yet another delegate expressed that he would be "disheartened" if a canal were to be financed by revenues from lotteries, advocating that the money come directly from the treasury instead of "drawn from the poorest and most miserable wretches in community" (*id.*). Ultimately, the Convention amended the Constitution to provide that "no lottery shall hereafter be authorized in this state" (Lincoln at 44). The debate leading up to the amendment foreshadowed a growing concern about gambling, even beyond lotteries, setting the stage for greater constitutional restrictions some decades later.

B

After the Constitutional Convention of 1821, gambling in New York State began to evolve beyond lotteries. Pari-mutuel horse-race betting was invented in 1867 and exploded in popularity in Europe. After the new form of betting came to New York, the legislature in 1887 accommodated horse-racing interests by passing the Ives Pool Law. The Ives Pool Law explicitly authorized racing and pool-selling for about five months of the year, authorized certain racing associations to conduct races for limited periods within this five-month stretch, and taxed the gross receipts for admission on race days (*id.* at 47). Much as is the case with IFS, our legislature saw an opportunity to raise revenues by authorizing, licensing and taxing the new form of gambling.

The Ives Pool Law sparked a strong backlash. Indeed, the year 1894, when New York had its next Constitutional Convention, was a "highwater mark for antigambling

sentiment in New York" (Peter J. Galie & Christopher Bopst, The New York State Constitution 83 [2d ed 2012]). The new law faced immediate constitutional challenges in the courts. The day the 1894 Constitutional Convention convened, a panel of the General Term held that the Ives Pool Law was unconstitutional, a decision the New York Times described at the time as one that "surprised no one, as all intelligent racing men knew that this would be the outcome of any attempt to test the constitutionality of the law in the courts" (*The Ives Pool Bill Illegal: So Judge Pryor Decides in the* Irving *Case*, NY Times, May 8, 1894, at 3, col. 1; *Irving v Britton*, 8 Misc 201 [Ct. Common Pleas 1894]). After that decision, the Fourth Department separately held that the Ives Pool Law was *not* unconstitutional, concluding that the activities authorized by the Ives Pool Law did not fall within the Constitution's prohibition against "lotteries" (*Reilly v Gray*, 28 NYS 811, 815 [4th Dept 1894]). The question of whether pool-selling was a prohibited lottery under the Constitution, however, gave way to a broader sentiment: that the Ives Pool Law exposed the need for a stronger and more expansive prohibition against gambling in the Constitution. The existing prohibition against lotteries was no longer sufficient, and the people of New York could not rely on the legislature to prevent gambling.

At the 1894 Constitutional Convention, delegates emphasized that the legislature's authorization of racing and pool-selling in the Ives Pool Law required a forceful response by the Convention: a constitutional amendment to establish a sweeping prohibition against gambling—one that could not be overcome by future legislative action. Delegates described the Ives Pool Law as "an act dangerous to public morals" that authorized "the most iniquitous, vile, and wretched business that has ever been carried on within the

borders of this state" (Lincoln at 50-51). One delegate "implore[d] that an end shall be put

to [the practice] forever" and called upon his peers to "[s]weep the whole brood together,

-- gamblers, poolsellers, bookmakers, -- all other racing fraternity into oblivion forever"

(*id.* at 51). Other delegates echoed that desire. One delegate urged the Convention to "put

the seal of our condemnation upon all kinds of gambling" and emphasized that "[w]hat we

want to-day is to condemn all kinds of gambling, bookmaking and everything else" (4 Rev

Rec, 1894 NY Constitutional Convention at 1086).

Delegates understood that forms of gambling would change with time and sought

to ensure the amendment would be far-reaching enough to account for future changes. One

delegate, for example, stated that "while every one admits that book-making and pool

selling are prevailing crimes to-day and very injurious to the young men of the State, as

well as the old men, we should not limit [the prohibition], and while we are about it we

should prohibit in the Constitution all forms of gambling" (*id.* at 1087). Another delegate

expressed that without a broad prohibition against all forms of gambling, "[i]t will not be

twenty-four hours before they would have some new scheme of gambling, and the evil

would still exist" (*id.* at 1124). One delegate proclaimed that a constitutional prohibition

against gambling "should be so broad as to prohibit not only the boy upon the street, who

gambles away a few pennies which he may earn from day to day, but it should [also]

prevent poker playing in the Union Club in New York" (*id.* at 1118-1119).[2]

_____

[2] The majority acknowledges that the Ives Pool Law "prompted delegates to the
Constitutional Convention of 1894" because they were "critical of the legislature's
decision to carve out particular seasons and locations for betting on horse races"

Delegates to the 1894 Convention also believed a broad constitutional prohibition against gambling was imperative to prevent the legislature, which had failed to prohibit gambling, from affirmatively authorizing gambling in the future as it had with the Ives Pool Law. The kind of gambling that arose after the initial constitutional prohibition on lotteries had "proved more powerful than the Legislature, and therefore, [required] the power of a Constitutional Convention to prohibit it" (*id.* at 1117). Though "[t]here is no one but that says [the gambling] should be stopped, [ ] no one but agrees that the Legislature is impotent to stop it, and [a Constitutional Convention] is the only place to stop it" (*id.*). Delegates believed that a broad prohibition against gambling was necessary because "there never should be a law affirmatively justifying gambling", and the prohibition's effect would be "to avoid [such] legislation" (*id.* at 1118, 1122). One delegate announced that the Constitution should provide "that gambling shall not be allowed," and "leav[e] it to legislative declaration what shall be the penalty for the violation" (*id.*). In other words, the legislature should be restricted, when it comes to gambling, to "fix[ing] a penalty for the violation of this [prohibition] of the Constitution", without any power to authorize gambling on its own (*id.*). Another delegate urged a broad constitutional prohibition because "[y]ou will never get the Legislature to do anything about it"; the legislature "will not pass any law for the suppression of gambling" (*id.* at 1124). Yet another delegate decried that "every effort to induce the Legislature to come to the rescue has been futile"

---

(majority op at 10), but it fails to account for the extent of the outrage created by the law. The Ives Pool Law did not merely prompt the delegates to the Constitutional Convention, it caused a significant backlash and animated the constitutional prohibition on gambling ultimately adopted by the delegates in 1894.

(*id.* at 1129). The answer, he believed, was a broad amendment that would "[m]ake no half-way work" and eliminate all forms of gambling in toto (*id.* at 1130).

The Convention understood that gambling business interests seeking to sway the legislature were "many and powerful" (*id.* at 1112). One delegate believed that "[t]he agents of the pool selling interests . . . will leave unused no influence, open or secret, to defeat any attempt to deprive them of their opportunities" (*id.* at 1080-81). Another delegate feared the "inventive genius of the men who are capable of conducting pool selling and bookmaking" (*id.* at 1112). The delegate explained that if the Convention limited its prohibition to pool selling and bookmaking only, the gambling organizers "will devise some means other than pool selling and bookmaking by which they can gamble just the same as ever" (*id.*). Another delegate echoed concerns about "the wit of the gamblers and their attorneys", worrying that—if a constitutional prohibition were limited to pool selling and bookmaking alone—"it will not be three months after [such an] amendment goes into effect before they will have some other device . . . [that] serves their purpose equally well" (*id.* at 1119).

For other delegates, Louisiana offered a cautionary tale on the lobbying power of gambling organizers. According to one delegate, Louisiana "was almost ruined, politically and morally, by the existence of the hydra-headed monster of lotteries" (*id.* at 1082). The very people "who were at the head of the great lottery business in that State, many of them after being driven from there, moved to New York and established themselves as racing men, and set up pool selling and bookmaking, far worse and more dangerous than lotteries" (*id.*). The delegate denounced the acts of gambling organizers to corrupt the Louisiana

legislature by "offer[ing] the State of Louisiana thirty millions of dollars to be allowed to continue the lottery business in that State" (*id.*). Though "public sentiment was aroused and their offer was spurned, . . . [n]ow, many of the same men driven from Louisiana have settled themselves in the State of New York" and the delegates were called "to decide whether this system of gambling, in its worst aspect, shall thrive in this State" (*id.* at 1082-1083). Another delegate resurfaced the "hard fight" in Louisiana, which involved "[t]he lottery [interests] offer[ing] [the State of Louisiana] immense sums for the privilege" (*id.* at 1121). That delegate acknowledged that he was "not awed by [the] suggestion that the pool men [in New York] will raise a large fund of money and put it into the campaign against our party" because "they have been doing that every year since the Ives bill became a law" (*id.*). Thus, as much as the delegates were concerned about the ills of gambling and the unreliability of the legislature in preventing it, they were also worried about the political process in New York and protecting government decision-making from powerful money interests; the "cause of good government" motivated the 1894 delegates in their ultimate decision that the Constitution should broadly prohibit gambling (*id.* at 1122).

After extensive and unequivocal pronouncements by delegates as to the evils posed by gambling, the Convention acted decisively to prohibit gambling expansively. The Convention amended the Constitution, with 109 delegates voting in favor and only 4 delegates voting against, adding a broad prohibition against gambling: "Nor shall any lottery *or the sale of lottery tickets, poolselling, bookmaking, or any other kind of gambling hereafter be authorized or allowed within this state; and the legislature shall pass*

*appropriate laws to prevent offenses against any of the provisions of this section*" (*id.* at 48 [italics indicating text added by the 1894 Convention]).

The 1894 amendment caused some concern that the phrase "or any other kind of gambling" could be "sweepingly inclusive" (*The Poolselling Amendment*, NY Times, Oct. 15, 1894, at 4, col. 3 [internal quotation marks omitted]). That concern put people involved in exchanges for securities and "materials of the earth" "in a state of considerable alarm" (*id.*). The New York Times commented that "[i]f there were any real danger that the prohibition of gambling would be construed to include dealings in stocks and commodities in organized Exchanges, we should say that the whole list of amendments tied up with this one [ought] to be beaten and their authors censored by a mass meeting for submitting such owlish and mediaeval proposition[s]" (*id.*). The Times "[did] not think the danger exists," because to think of stock market and commodities "speculation as gambling is contrary to modern enlightenment" (*id.*). Instead, "[t]he racing men, of course, know that the amendment is aimed directly at them" and "[t]here is not the slightest doubt about [the amendment's] intent" (*id.*). The meaning of "gambling" in the constitutional amendment, therefore, was not understood to rest on the relative measures of skill or chance in providing a return on money invested or wagered, but on a common understanding of the difference between investing and betting. Delegates, stockbrokers and the public understood that those exchanges did not constitute gambling and were not within the ambit of the constitutional prohibition, without any reference to the level of skill or chance in those activities.

The most nearly contemporaneous expression of the conception of gambling at the time was contained in the 1895 Penal Law, which prohibited "record[ing] or register[ing] bets or wages, or sell[ing] pools upon the result of any trial or contest of skill, speed or power of endurance, of man or beast . . . ." Although the 1895 Penal Law does not determine the constitutional definition of gambling, it provides one additional piece of evidence as to what was understood to be "gambling" very close in time to the adoption of the constitutional prohibition.[3]

C

Even decades after the 1894 amendment to the Constitution, the legislature's actions continued to evidence a broad conception of the "gambling" prohibited by the Constitution. In 1939, the legislature sought to authorize pari-mutuel betting at authorized tracks, to "provide an effective legal control of wagering on horse racing and thus protect the public interest" and to raise revenue (Statement by the Joint Legislative Committee for Study of Pari-Mutuel System, 1941 Legis Doc No. 69 at 14). To do so, the legislature understood that it needed to amend the Constitution. The legislature approved an amendment for popular referendum, and the people of New York ultimately voted in favor of the amendment that same year (*id.*; *1,225,495 Approved Pari-Mutuel*, NY Times, Dec. 10,

---

[3] It is important not to conflate the modest insight the 1895 Penal Law may provide into the constitutional definition of gambling with subsequent or contemporary Penal Law interpretations of gambling. The 1895 Penal Law represents one notion of gambling *nearly simultaneous with the time of* the 1894 Constitutional Convention. In contrast, subsequent or contemporary Penal Law definitions of gambling are divorced from the 1894 Convention's understanding of gambling and—as the delegates widely feared—are much more likely to reflect legislative attempts to circumvent the broad definition of gambling than to shed light on the constitutional meaning of the term.

1939, at 2, col. 3). As the majority details, the Constitution has been amended repeatedly to permit certain forms of gambling—in 1957 and 1975 to permit certain games of chance like bingo or lotto operated by certain religious, charitable and nonprofit organizations; in 1966 to allow the legislature to create a state lottery to fund education; and in 2013 to authorize casino gaming at certain locations in the state (majority op at 11). The majority, however, misses the point of those amendments. Even if the amendments can be taken to show that the public's views on gambling have changed (*id.*), they underscore that the process for authorizing new forms of gambling is through a constitutional amendment approved by the people of the State. Surely the Constitution does not allow us to conclude that because past voters approved some form of gambling, we are no longer required to obtain the approval of today's voters for a different form.

The history of New York's laws and the constitutional prohibition on lotteries and gambling demonstrates that delegates, legislators, and the public alike understood the Constitution's prohibition on gambling to be far-reaching. That history also shows that the definition of "gambling" did not revolve on the relative weights of skill and chance. Instead, the constitutional prohibition sought to eliminate a broad category of activities that legislators and delegates worried were impoverishing, distracting, or even corrupting New York's people. That was exactly the Attorney General's stated concern when he sued DraftKings and FanDuel, and the issue motivating the plaintiffs here.

### III

Disregarding the clear historical understanding of the word "gambling" in our Constitution, the majority manufactures a constitutional definition of gambling along a

skill-chance divide. The majority holds that the constitutional prohibition on gambling encompasses two types of activities: (i) "the staking of value on a game in which the element of chance predominates over the element of skill", and (ii) "the risking of value through bets or wagers on contests of skill where the pool of wagered value is awarded upon some future event outside the wagerer's influence or control" (majority op at 23). In other words, "games in which skill predominates over chance", as well as "skill-based competitions for predetermined prizes in which the participants have influence over the outcome" are *not* "gambling" under the Constitution (*id.*). That definition belies our constitutional history and is unworkable.

A

The history and text of article I, § 9 of our Constitution make clear that the prohibition on gambling is broad and the definition arises not from any relative measure of chance or skill, but from the common understanding of what types of activities constitute gambling. Players skilled at counting cards are better able to win at blackjack than those who are unskilled, but that does not exempt blackjack, if played for money, from the prohibition on gambling. The Attorney General, now defending DraftKings' and FanDuel's operations as constitutional, admits that because poker involves a substantial amount of skill and highly skilled poker players—just like highly skilled IFS players— reap the lion's share of winnings, poker would not constitute "gambling" under the Constitution, except for the fact that it was thought of as gambling at the time and now we are stuck with that anomaly. That admission underscores how the definition employed by the majority cannot comport with the constitutional meaning of "gambling": under the

majority's definition, poker, blackjack and commonly understood forms of gambling are not gambling, because of the level of skill they entail. Everybody understands that stock and commodities trading is excluded from the Constitution's prohibition on gambling, but trading is not principally a "skill-based" activity and is highly dependent on contingent future events completely out of control of the traders. Nobel Laureate Daniel Kahneman has written that the stock market "appears to be built largely on an illusion of skill", and other research shows that active traders in stocks have net negative returns when compared to the stock indices (*see* Brad M. Barber & Terrance Odean, *Trading Is Hazardous to Your Wealth: The Common Stock Investment Performance of Individual Investors*, 55 J Finance 773 [2000] ["(I)nvestors hurt their gross performance by trading"]; Kenneth R. French, *Presidential Address: The Cost of Active Investing*, 63 J Finance 1537 [2008] ["(T)he typical investor would increase his average annual return by 67 basis points over the 1980-2006 period if he switched to a passive market portfolio"]; Alessio Emanuele Biono et al., *Are Random Trading Strategies More Successful than Technical Ones?*, 8 PLOS ONE e68344 [2013] ["(F)or the individual trader, a purely random strategy represents a costless alternative to expensive professional consulting, being at the same time also much less risky, if compared to the other trading strategies"]). The skill/chance dichotomy does not let us separate activities clearly not within the constitutional prohibition of gambling, such as stock or commodities trading, from betting on sports.

There is no logical way to differentiate activities that everyone understands do not constitute gambling from those that do: both may involve some measure of skill and chance, and both depend on future events that the investor or bettor cannot influence.

Instead, as the history of the 1894 amendment demonstrates, ascertaining the definition of

gambling is not a purely logical exercise conducted in a void. Rather, it requires a careful

examination of the historical and social context in which the 1894 amendment was placed

in our Constitution, including looking to societal judgments about what types of activities

constitute gambling and what constitute desirable commercial speculation. Betting on

sports has consistently been understood to constitute gambling. IFS contests involve

betting on the performances of a collection of individual players, rather than the

performance of a real team, but they nevertheless involve betting on sports outcomes—an

activity clearly understood to constitute gambling.[4]

The constitutional meaning of gambling does not turn on some weighing of skill

and chance, but rather on what types of activities are commonly understood to constitute

gambling. At the time of the 1894 Convention, people generally understood that the stock

and commodity markets could be thought of as betting on uncertain future events over

which they had no influence, but the universal understanding was that those activities were

not gambling—for reasons having nothing to do with the relative weight of skill and

---

[4] The majority mischaracterizes my view for why IFS contests are gambling, stating that this dissent "attempts to portray IFS contests as unlawful 'gambling' simply because they relate to professional sporting events" (majority op at 22-23). When the New York Giants drafted Daniel Jones sixth overall and signed him to a $25.6 million four-year contract, they most certainly did so in relation to a professional sporting event. Although his future performance was not then knowable, the relation to a sporting event does not determine whether the Giants' action was gambling under the Constitution (which it was not). Two things distinguish it from IFS: (1) the Giants have some ability to affect Jones' future performance (which IFS bettors selecting him do not); and (2) we understand that entering into employment contracts is a socially desirable activity and not "gambling" within the meaning of the Constitution, even though an employee's future performance has an inherent measure of uncertainty.

chance. Nothing in the relevant history suggests that the Convention, or the legislature at that time, or the public generally, thought that stock and commodity trading was removed from the definition of gambling because more skill than luck was involved. Instead, the common understanding was that investments in stocks and commodities—regardless of the risk or skill involved—were simply not gambling because of a societal judgment about the nature and utility of those activities and their importance to a flourishing market economy.

The very purpose of placing the prohibition on gambling into our Constitution was to prevent alteration by mere legislative action. New York's Constitution, to be sure, has proved far easier to amend than the United States Constitution. It has been amended several hundred times, and constitutional amendments are regularly put to the voters. To allow betting on horse races, the people overwhelmingly approved the 1939 constitutional amendment. Subsequent amendments to article I, § 9 in 1957, 1966, 1975, and 2013 underscore that IFS can be legalized in New York, but only through a constitutional amendment. During the time this issue has ping-ponged from the Attorney General's suit to bar IFS to its current defense of IFS as not gambling, eight proposed constitutional amendments have been put to the voters of our state. If the legislature wanted to legalize IFS, it could and should have put that question to the voters, which is precisely what the 1894 Convention concluded would be necessary to modify its broad prohibition.

B

The majority misinterprets the constitutional definition of gambling by assuming an equivalency with later penal definitions of gambling. To support its mistaken view that "[w]hen the 1894 Constitution was adopted, 'games of chance' were commonly understood

to be those where chance was the '*dominating* element that determines the result of the game'" (majority op at 15 [emphasis in majority opinion]), the majority quotes *People ex rel. Ellison v Lavin* (179 NY 164, 170-171 [1904]). *Ellison*, however, held that a contest awarding money to people for guessing the number of cigars the United States would collect taxes on during a given month was an impermissible *lottery* under the *Penal Law*— not whether it constituted "gambling" under the *Constitution* (*id.* at 168, 170-73).

To the extent *Ellison* has any relevance to the present case, it cuts against the majority's position. A cigar company sponsored a contest in which the winners were to be determined by how closely they were able to estimate the number of cigars that would be sold in the United States in the month of November 1903. The United States Tobacco Journal, a trade newspaper, published an advertisement announcing the competition and providing its rules and information showing the monthly cigar sale totals for several preceding years. The newspaper's publisher was arrested and charged with violating Penal Code § 327, which made it a misdemeanor to advertise a lottery. Section 323 of the Penal Code defined a lottery as: "a scheme for the distribution of property by chance, among persons who have paid or agreed to pay a valuable consideration for the chance" (*id.* at 168).

The Appellate Division held that "the knowledge of the condition of the tobacco trade, the importation of cigars and similar matters not stated in the advertisement would enable those possessing the information to estimate [the number of cigars] more accurately than others ignorant of these conditions . . . [and therefore] the distribution would not depend exclusively on chance, but, to some extent at least, be affected by the exercise of

judgment, and that, therefore, the scheme did not constitute a lottery" (*id.* at 169). Thus, the question before this Court in *Ellison* was whether the contest, in which those with greater access to data and skill in predicting future events based on that data, would constitute a "scheme for distribution of property by chance." We held that the contest remained a contest of chance even though some skill was involved, because chance was the "dominating element," and therefore the contest was one of "chance within the meaning of the statute" (*id.* at 174).

Obviously, *Ellison* has nothing to do with the meaning of "gambling" in the Constitution. The Penal Code definition was not of "gambling," but of a "lottery," which under the Constitution is just one form of gambling. Indeed, the Penal Code statute at issue in *Ellison* did not mention "gambling" at all. Its prohibition was far narrower than the Constitution's prohibition of "poolselling, bookmaking, or any other kind of gambling."

Interestingly, though, the argument in *Ellison* that persons who obtained additional data about cigar sales and imports and who were better skilled in statistical interpretation brought a measure of skill to the contest so that it was no longer one of chance, are much like the arguments made here to urge that IFS is not gambling. In *Ellison*, we rejected those arguments when applied to the much narrower definition of "chance," even though the presence of some measure of skill did not render the contest one of pure chance. *Ellison*'s rejection of the proposition that "chance" means "pure chance" evidences an understanding that the Penal Law prohibitions of lotteries should not be evaded by injecting into a competition some measure of skill allowing some participants to do better than others. Correspondingly, *Ellison*'s approach suggests that the injection of some measure of skill

into the selection of fantasy rosters in IFS contests should not remove IFS from the (much broader) constitutional definition of gambling.

After misapplying *Ellison*, the majority cites a string of cases for its claim that "New York courts have historically applied the dominating element standard to determine whether a particular activity constituted a 'game of chance'—reflecting a shared understanding that 'gambling' encompasses those games dominated by chance, not skill" (majority op at 16). Like *Ellison*, each of those cases' discussion of whether an activity had a dominating element of chance involved *statutory* constraints on gambling—not the Constitution's prohibition of gambling (*see People ex rel. Lawrence v Fallon*, 152 NY 12, 17 [1897] [discussing whether a contest of speed of animals for prizes violated the Penal Code's statutory prohibition against lotteries and the sale of lotteries]; *Shapiro v Moss*, 245 App Div 835, 835 [2d Dept 1935], *affd* 270 NY 609 [1936] [citing *Ellison* and finding that a mechanical bagatelle game was improperly licensed because it was gambling]; *People v Stiffel*, 61 Misc 2d 1100, 1100 [App Term, 2d Dept 1969] [citing *Ellison* and reversing convictions of defendants for allowing their premises to become disorderly by allowing wagering on three games of billiards]; *People v Li Ai Hua*, 24 Misc 3d 1142, 1145 [Crim Ct, Queens County 2009] [granting defendant's motion to dismiss the accusatory instrument for facial insufficiency because the information contained no factual basis for the conclusion that the game defendant was participating in was gambling under the Penal Law]; *Valentin v El Diario La Prensa*, 103 Misc 2d 875, 878 [Civ Ct, Bronx County 1980] [discussing *Ellison* and finding that the sale of voting coupons was void against public policy]; *People v Cohen*, 160 Misc 10, 11 [NY City Magis Ct 1936] [finding defendant

improperly charged with violating the Penal Law because a device he had in his establishment—allowing participants to shoot at a target for a prize—was a game of skill]). Like *Ellison*, all those cases interpret penal statutes, not the constitutional prohibition on gambling. As Supreme Court held (undisturbed by the majority), the legislature has substantial discretion in how to enforce the constitutional prohibition on gambling. Thus, the legislature need not criminalize everything that meets the constitutional definition of gambling (*see People ex rel. Sturgis v Fallon*, 152 NY 1, 10 [1897] [rejecting challenge to the legislature's reduction of the penalty for horse-rase betting]). Instead, as the majority acknowledges, the legislature "is free to extend statutory prohibitions on games of chance beyond those prohibited by the Constitution" (majority op at 17 n 6). By the majority's own admission, then, the Penal Law's varying prohibitions of various types of gambling activities have no bearing on the constitutional definition.

**IV**

Even if it were proper to consider the relationship of skill and chance in determining whether IFS contests are gambling under the constitutional definition, the majority's analysis is not credible. First, the parties stipulated that "[p]articipants cannot control how the athletes on their fantasy sports teams will perform in such sporting events," and the majority itself acknowledges that IFS "participants are not able to influence athlete performance in actual sporting events" (majority op at 18). There is no escaping the real-world fact that IFS bettors have absolutely no influence on how any of the athletes they have selected will perform. Incongruously, in defiance of the parties' stipulated fact and the majority's own acknowledgment of that fact, the majority concludes that the plaintiffs

here have not "met their heavy burden of establishing beyond a reasonable doubt that the IFS contests authorized by article 14 constitute 'bets or wagers' on future events outside of the contestants' influence or control" (*id.* at 19).

To explain why betting on the future performance of a selected handful of athletes does not constitute gambling, the majority digs an even deeper hole for itself. The majority attempts to distinguish "'bets and wagers' of gambling activities from lawful contests that award prizes to competitors—contests integral to the fabric of American social life, spanning the range from spelling bees to golf tournaments to televised game shows" (*id*.) Leaving aside whether IFS is "integral to the fabric of American social life," I control my performance in a spelling bee. I control my performance in a golf tournament. I control my performance in a televised game show. I do not control Tom Brady's performance in a football game.

The case cited by the majority to illustrate its gambling vs. prize competition distinction, *People ex rel. Lawrence v Fallon* (152 NY 12 [1897]), roundly disproves the majority's argument. In *Lawrence*, we considered the constitutionality of a statute that (1) authorized associations to host races for prizes to be contributed by the corporations, the owners of horses competing in the races, or by others who were not participants in the race, and (2) prohibited any person other than the owners of the competing horses from having any pecuniary interest in the prizes (*id.* at 18). Each of the entrants in the race in *Lawrence* had trained and prepared its own horse for the race, giving it some measure of influence over the performance of the actual competitor in the race (the horse). We held that "[t]here is a plain and obvious distinction" between a contest where the sponsor offers a fixed prize

to the winner, unaffected by the number of entrants or money received in entrance fees (not gambling) and "a race where the stake is contributed by the participants alone, and the successful contestant is to have the fund thus created" (gambling) (*id.* at 18-19). We concluded that "[t]he latter is a race for a mere bet or wager, while the former is for a prize offered by one not a party to the contest" (*id.* at 19). To explain the difference between gambling and not gambling, we pointed to a variety of activities commonly thought of as prize contests, to contrast those to gambling, namely: "the farmer, the mechanic, or the stock breeder who attends his town, county, or state fair, and exhibits the products of his farm, his shop, or his stable, in competition with his neighbors or others, for purses or premiums," which we noted, as a matter of common understanding, were not gambling.

Three propositions in *Lawrence* help understand the constitutional meaning of "gambling": (1) contests where payouts are based on the total amount paid to enter the contest are gambling, whereas a fixed prize offered by the promoter of a competition could suggest a contest is a prize competition and not gambling; (2) people who enter their own horse, pig, dog, jams or pie in a contest have some influence over the future contingent outcome because they bred the horse, fed the pig, trained the dog, grew the fruit and composed the jam, or baked the pie, which suggests that the contest is not gambling; and (3) most importantly, a commonplace understanding of "gambling" grounds the constitutional definition of the term. We know that the Constitution does not prohibit, as gambling, day trading in stocks or entering Wilbur in the state fair. We know it prohibits a casino sponsoring poker played for money.

Those three propositions work in concert. For example, if a contest has fixed payouts, satisfying proposition (1), but does not involve people entering themselves or things they control into the contest, failing proposition (2), then that contest would constitute gambling, falling within the commonplace understanding of the term under proposition (3). The majority fixates on the first proposition, stressing that the legislature through article 14 ensured it was authorizing only IFS contests that have predetermined prizes that are set by a neutral operator and that do not change with the number of participants. Even if the IFS contests authorized by article 14 meet that proposition, they clearly constitute "gambling" under the second and third propositions of *Lawrence*. Claiming that what would otherwise be gambling is not, merely because the million-dollar jackpot is a fixed amount, is precisely "the wit of the gamblers and their attorneys" that the 1894 Convention sought to curb. The Convention instead entrusted the voters with the exclusive authority to determine which forms of gambling to allow.

The majority attempts to satisfy the second proposition by claiming that the selection of IFS rosters itself represents some control over the future contingent outcome. That is a sophistry: that "control" is merely the decision of what to bet on, not any influence over how the subjects of the competition—the athletes—will perform. The purported "skill" involved is a skill in betting, not a skill in influencing the actual underlying athletic events. It is the same "skill" that we rejected in *Ellison* as insufficient to remove the cigar competition from the Penal Code's definition of "chance." I agree that at least some IFS bettors "draw from their knowledge of the relevant sport, player performance and histories, offensive and defensive strengths of players and teams, team schedules, coaching

strategies, how certain players on opposing teams perform against each other, statistics, strategy, and the fantasy scoring system in order to exercise considerable judgment in selecting virtual players for their rosters" (majority op at 17-18), but the same would be true of persons placing a bet on the number of touchdowns an individual football player would score in tomorrow's game. The Attorney General agrees that such a bet would be gambling—a "prop bet"; the aggregation of those prop bets into one big prop bet does not constitute any skill other than the skill in placing a bet. The "skill" is in the determination of what to bet on—not in affecting the outcome of the underlying future contingent events. Someone who owns a horse, trains it, and enters it into a competition in which the owner is rewarded based on the horse's performance has some ability to affect the outcome of the competition. A person who assembles a slate of horses, NASCAR drivers or football players has no ability to affect the performance of any of those persons in the competition. In short, IFS is merely a group of individual bets, where the payout is determined by the sum of the individual bets, and there are rules around how the group of bets may be placed.

The Ives Pool Law, allowing pari-mutuel horse betting, formed the impetus for broadening the constitutional prohibition against gambling. Subsequently, to legalize horse-race betting, the Constitution was amended by popular vote. The same arguments made to urge that IFS is not gambling could have been made about horse racing. A horse racing bettor can assemble a slate of horses much like an IFS "team." For example, betting a "trifecta box" allows you to win if the three horses you choose finish first, second and third in any order. Betting an "exacta part wheel" pays you if you pick the winner and any one of the several other horses you pick comes in second. Betting a "pick six" pays you if

you successfully select five or six of the horses that win in six separate races. As with IFS, some people study horses and track conditions in depth and are better informed and thus more likely to win (*compare, e.g.,* Nicely-Nicely Johnson *with* Freddy Eynsford-Hill). Daily racing forms and other publications with highly detailed information about individual horses, track conditions, jockey performance, etc., are available (and at least one, the Daily Racing Form, has been available since the late 1800s) to allow bettors to educate themselves just as IFS bettors can access and evaluate player statistics before assembling their fantasy lineups. Nevertheless, the courts and legislature understood that those features did not remove horse racing from the constitutional prohibition of gambling; therefore, a constitutional amendment was required. IFS wagers are no different than winning the trifecta box, exacta part wheel, or pick six at a racetrack; they are still dependent on future contingent events over which the bettors have no control, even if skill in picking players or horses greatly affects the chance of winning. The aggregation of the horses in a race or across races, and any level of skill involved in selecting them, does not change that the activity at its core is gambling, or that the "skill" involved is merely the skill in placing the bet, not the skill in spelling "murraya" to win the Scripps National Spelling Bee. The same is true of IFS.

The majority's additional observation, that "unlike bets or wagers on games of skill in which a bettor takes no part, participants in IFS contests engage in a distinct game of

their own, separate from the real-life sporting events, in which they strive against other IFS participants," does not transform gambling into non-gambling (majority op at 22).[5]

## V

Determining what the New York Constitution means is exclusively the responsibility of the courts. The separation of powers doctrine that upholds our state's democracy demands it. The majority disrupts the balance of power in our state and effectively amends the Constitution, bypassing the voters. The majority does this by establishing a definition of "gambling" that contradicts the Constitution's plain meaning and history and that instead bows in deference to the legislature's preferences.

Over several decades, the Constitution has been amended to authorize several types of gambling. No amendment has authorized IFS. In authorizing and regulating interactive fantasy sports through article 14, the legislature impermissibly bypassed the means by which new forms of gambling can be made lawful. If people in New York want to allow interactive fantasy sports, they must vote for it. Amending our state's Constitution is neither uncommon nor infrequent, as evidenced by the amendments to the gambling provision itself, as well as to the forever wild provision discussed in *Protect the Adirondacks!* (37 NY3d at 77, 81 [noting that a provision in the Constitution requiring that the forest preserve within the Adirondack Park "shall be forever kept as wild forest lands"

---

[5] If, instead of buying a lottery ticket, we bet on whether anyone will hit the Powerball jackpot this week, or bet on whether both the Powerball and MegaMillions jackpot will be hit during the same month, we are engaged in a "distinct game of our own, separate from" the lotteries, but we are still gambling: we are still betting on the outcome of future events over which we have no control.

had been amended 19 times prior to the Court's holding in that case that a state plan to build 27 miles of trails through the forest preserve was unconstitutional]). In fact, by the late 1980s alone, New York's Constitution had been amended more than 200 times (William H. Manz, Gibson's New York Legal Research Guide 3 n1 [4th ed 2014]).

When the delegates to the Constitutional Convention of 1894 prepared to promulgate the expansive prohibition against gambling in our Constitution today, they worried about the powerful money interests that are inextricably intertwined with gambling. The delegates were concerned about how lottery operators in Louisiana attempted to buy that state's legislature, offering millions in exchange for permission to continue operating their business there. The Louisiana lottery and scandal bled into other states, ultimately sparking federal action (*see* Nelson Rose, *Gambling and the Law: The Third Wave of Legal Gambling*, 17 Villanova Sports & Ent LJ 361, 371-374 [2010]). The delegates understood that the same lottery operators from Louisiana had set up shop in New York; the gambling operators then in our State were strategic and powerful. For the delegates, "[t]he infamy which [the] amendment [prohibiting gambling] seeks to destroy is the creature of politics, and of the basest order of politics" (4 Rev Rec at 1124). To protect the democratic process, foster good government, and protect decision-making from the unsteady influence of money interests, the Convention adopted our Constitution's prohibition against gambling expressly to prevent the legislature from passing laws authorizing gambling; that decision thereafter belonged to the people of this State.

The 1894 Convention anticipated that gambling companies like DraftKings and FanDuel would emerge, would create new and popular forms of gambling, and would engage in expensive campaigns to sway our legislature. What that Convention could not have anticipated is that, having squarely put the expansion of any form of gambling exclusively in the hands of the voters, our Court would defer to legislative "findings" to strip voters of their rights under our Constitution.[6] The tragedy of today's decision is not the legalization of gambling; it is the usurpation of the constitutional process.

IFS contests are clearly gambling under our state Constitution. The legislature may nevertheless believe that the benefits of IFS contests—through taxation, for example— outweigh the harm to people like the plaintiffs here and others.[7] The majority's perception that popular opinion towards gambling has changed since 1894 may be true (though the plaintiffs here would not agree), but the majority cannot usurp the voters' prerogative to maintain or alter the meaning of gambling in the Constitution. The majority abandons that bedrock democratic principle, subverting this Court's responsibility, and the people's

---

[6] Those findings, which concern the relative level of skill and chance involved in IFS, are irrelevant to determining the meaning of "gambling" under the Constitution, and irrelevant as well once the proper definition—which does not turn on skill versus chance—is applied.

[7] Scholars warn, however, that the legalization of gambling for tax revenues constitutes a regressive tax on the poor—increasing poverty and exacerbating pre-existing social problems (*see* John Warren Kindt, *U.S. National Security and the Strategic Economic Base: The Business/Economic Impacts of the Legalization of Gambling Activities*, 39 St Louis U LJ 567, 579 [1995]; John Warren Kindt, *Legalized Gambling Activities As Subsidized by Taxpayers*, 48 Ark L Rev 889, 894-899 [1995]; Emanuel V. Towfigh et al., *Dangerous Games: The Psychological Case for Regulating Gambling*, 8 Charleston L Rev 147, 152 [2013]). Those same concerns were voiced by the 1894 Convention delegates who adopted the broad prohibition of gambling.

power, as embodied in a constitutional provision whose purpose was to prevent repeal by mere statute, in deference to the legislature's preferences. We can only hope the decision does not crack the foundational principle we have thus far followed: that the three branches of government limit each other in important ways to protect the rights of the people of our state.

Order insofar as appealed from reversed, with costs, and defendants' cross motion for summary judgment declaring that article 14 of the Racing, Pari-Mutuel Wagering and Breeding Law does not violate article I, § 9 of the New York Constitution granted. Opinion by Chief Judge DiFiore. Judges Singas, Cannataro and LaSalle concur. Judge Wilson dissents in an opinion, in which Judges Rivera and Troutman concur. Judge Garcia took no part.

Decided March 22, 2022